# .CHARLESTON.

C. C. WILSON *et als.* v. W. M. McCoy and HARVEY MILLER.

Submitted March 23, 1920.    Decided April 6. 1920.

1. APPEAL AND ERROR—*Boundaries*—*New Trial*—*Conflict in Monument Held for Jury; Verdict on Conflicting Evidence in Absence of Preponderating Contrary Evidence Cannot be Disturbed,*

Where a deed calls for a line between monuments as well as by course and distance, one of which monuments is standing well marked and unquestioned, while the other has long since disappeared and its location is not definitely ascertained, and surveyors differ in their locations of the latter, with the result that recent surveys purporting to represent such line materially vary, each being supported by measurements to and from other known monuments, thereby enveloping its true location in doubt and uncertainty, the solution of the conflict so presented is peculiarly within the province of a jury, and its finding, in the absence of a clear preponderance of evidence to the contrary and of prejudicial error during the course of the trial, cannot properly be disturbed by the trial court upon motion or upon writ of error from this court. (p. 104).

2. WITNESSES—*Contradictory Statements Are Admissible to Impeach if Proper Foundation Has Been Laid.*

Contradictory statements of a witness as to material facts are admissible in rebuttal for the purpose of weakening or destroying the value of his testimony, provided proper foundation for such impeachment has been laid, though they may not be admissible as primary evidence of the controverted fact. (p. 112).

Error to Circuit Court, Roane County.

Action of unlawful entry and detainer by C. C. Wilson and others against W. M. McCoy and others. Verdict for defendants, and judgment thereon, and plaintiffs bring error.

*Affirmed.*

*Thos. P. Ryan* and *Pendleton, Mathews & Bell,* for plaintiffs in error.

*Harper & Baker* and *Hogg & Hogg,* for defendants in error.

LYNCH, JUDGE:

The judgment complained of upon this writ of error was entered upon a verdict for defendants in an action of unlawful entry and detainer brought to restore to plaintiffs possession of a parcel of land containing six and two-fifths acres, claimed by both parties, adjoining landowners, as part of their respective tracts. That owned by the plaintiffs comprises 50 acres called and known in the record as the Suttle tract and lies immediately to the south of the larger 200-acre tract owned by defendants. Both hold title under the same remote grantor. The ownership of the parcel in dispute depends upon the correct location of the northern boundary of the 50-acre tract and that in turn upon the location of its southern or base line. There is no conflict with respect to the calls.

Originally the lands owned by both parties and the acreage in dispute constituted part of a tract of 20,000 acres patented to Bartholomew and Antoine Terrason, but later divided into ten equal parts or lots and sold in 1839 by the commissioner of delinquent and forfeited lands for the county of Jackson. A copy of the plat of these subdivisions made by Nathan Smith and properly attested was filed at the trial. That part of the large tract which enters into this controversy was embraced in lot No. 10 of the Smith partition and the correct location of the southern line of that lot determines the corresponding boundary of plaintiffs' 50 acres. They coincide and have an important bearing in the solution of the questions at issue. The calls for that line, as disclosed by the plat, are: "Beginning at a white oak near the fork of Spring creek in the line of (lot) No. 1, the same being corner to No. 9, thence with the same N. 63½ W. 1,200 poles to a black oak in the most westerly line of the entire survey." Of the two monuments so called for the former is standing and its identity is not questioned, but the black oak has long since disappeared leaving but a slight, if any visible, trace of its former location.

Lying immediately west of the 50- and 200-acre tracts and constituting part of the western end of lot 10 is a boundary containing 400 acres known in the record as the William Roberts land. This tract John E. Wine conveyed to Roberts November 10, 1854, by the following calls for its southern boundary:

"Beginning at a black oak (referred to before as the western terminus of the base line dividing lots 9 and 10), corner to No. 9, and running with the line of No. 9 and 10, S. 633 (evidently one '3' too many) E. 500 p. to a white oak corner to Shearman self knowing centre tree;" etc. The southeastern corner of the Roberts tract, designated as a "white oak corner," also determines the southwestern corner of the 50-acre tract. This white oak, long since gone, but whose location is claimed by defendants and denied by plaintiffs to be represented by a stump, should not be confused with the white oak called for on the Smith plat as the beginning point and eastern terminus of the base line of lot 10.     They represent different corners and apparently are more than two miles apart.

Lying immediately east of the Roberts land is another boundary of 400 acres which once included both the 50- and 200-acre parcels.   This tract T. A. Roberts and wife conveyed to Lemuel Crislip July 7, 1855.  The first call of that deed is: "Beginning at a white oak, the same being corner to Wm. Roberts land," etc.   Crislip conveyed the 400 acres to Eli Perkins May 4, 1857, and the latter carved from the southwestern corner thereof a parallelogram containing 50 acres which he conveyed to Abner Suttle, from whom it derives its name.  This deed likewise calls for the Roberts corner as the beginning point, and "thence S. 62 E. 200 poles to the corner of W. Castos & L. Jenkins; thence N. 28 E. 40 poles to chestnut oak; thence N. 62 W. 200 poles to a sugar; thence S. 28 W. 40 poles to the begining."   Suttle reconveyed the parcel to Lemuel Crislip   December   2,   1865,   with   the   same   description, and   likewise   on that date Perkins   reconveyed   to   Lemuel Crislip   the   200-acre   parcel.    Through   mesne   conveyances from him as the remote common grantor defendants acquired the 200 acres and plaintiffs the 50-acre parcel immediately south of it, the calls of the latter in every instance referring to the Roberts corner as the starting point.

The true location of the base line, as it is called, of lot No. 10, therefore, is a prerequisite to the location of the Roberts corner, and the latter, when definitely ascertained pursuant to the calls of the deed of November 10, 1854, from Wine to William Roberts, will determine the southern corners and line of the

Suttle 50 acres, and they its northern boundary. Only in this manner can it definitely be ascertained whether that tract embraces the 6-2/5-acre parcel in dispute, or whether the latter falls within the boundaries of the 200-acre tract owned by defendants.

A. B. Thorn, J. J. Taylor and J. E. Wolfe, acting in concert as surveyors for and on behalf of plaintiffs, in endeavoring to fix and determine the true lines and corners of the Suttle 50 acres began at the white oak called for in the Smith plat of the 20,000-acre Terrason survey as the eastern terminus of the line common to lots 9 and 10 of that tract. They ascertained without serious difficulty the exact location of the white oak. It is still standing, marked and unquestioned. From that point they claim to have run a line on the course and for the distance laid down in the Smith partition map. This they did to locate as far as possible the position occupied by the black oak at the other extremity of that line, and therefrom, when so located, to fix and determine the southern boundary and corners of the Suttle 50 acres. The first object was important, as we have said, because the black oak corner identified both the terminus of the base they sought to locate and the beginning corner called for in the deed from Wine to Roberts; and the second would enable them to fix each and every line and corner of the Suttle tract, the calls of which are certain, definite and uncontroverted except as to location. The trial line so run by these surveyors met the western line of the Terrason survey at a point 16 or 18 rods south of the place finally decided upon by them as the location of the black oak.

The identity of the position occupied by the black oak as it stood when Smith partitioned the 20,000 acres Thorn and his associates fixed with reasonable certainty, they say, from information furnished by Daniel Roberts who, according to their testimony, professed to have seen the black oak and to have known and remembered where it stood, and from the proximity of ash sprouts evidencing the former existence at that point of an ash tree said to have been marked as a pointer to the black oak and often referred to as such by witnesses who testified upon the trial of the case. This information Roberts denied he gave to Thorn and his associates. They further attempted to verify

the location so made, by running two of the lines on the adjoining Katherine Hall land, which lines as run by them they told the jury followed fences on that tract.

But the effort to accomplish the object of their mission did not cease with the work so recounted. In addition to the efforts so made to verify and prove their work, they went, they said, to well established and undisputed corners of other neighboring and contiguous tracts of land carved out of the 20,000 acres, especially a hickory and beech on the north of the base line so established and a stone to the south in the Casto or Butcher farm, and from these verified and ascertained with reasonable certainty the accuracy of their location of the base line between lots 9 and 10 and of the black oak at its western end. They did, however, as some of defendants' witnesses testify, especially C. C. Sharp, and as they admit, find it necessary more than once, to alter the course first followed on leaving the white oak, alterations by them deemed necessary because of the evident departure from marked corners and monuments which they supposed and believed stood along the true course, and which alterations they also say were occasioned by their failure in the first instance to adopt the proper magnetic variation. After making these changes in degrees they did not return to the white oak and begin anew their survey from that point. This failure on their part is urged by way of casting doubt upon the correctness of the attempted location of the black oak 1,200 rods from the starting point, but they meet this criticism by saying such action was unnecessary because easily remediable by experienced civil engineers by means of proper measurements taken to adjust the departures recognized by them as essential for the purpose they had in view. However, after ascertaining as near as possible where the black oak at the western terminus of the line had stood, they did not attempt to verify their work by running back again to the white oak.

But the information thus obtained these surveyors swear was amply sufficient to enable them to state, and as witnesses they did confidently declare in the presence of the jury, their reasonable conclusion of the correctness of their work in every particular, and that from it they had determined the location of the southern boundary line and the two southern corners of

the Suttle 50 acres, and from these the other two corners and three lines thereof. In locating its corners and boundaries they began at a stone which they ascertained by measurements to be the southeastern corner of the Roberts farm and which, as we have said, constitutes the beginning point for the calls of the Suttle tract. The next call is, "thence S. 62 E. 200 poles to the corner of W. Casto and L. Perkins." Though the title papers for the last named tract designated such corner as a beech, no such tree was in existence at the time of this survey, but they did discover at approximately the required distance from the beginning a stone which appeared to have been set as a marker, and this they took as the second corner of the tract. The next call is, "thence N. 28 E. 40 poles to a chestnut oak." This tree likewise was not standing, but at 40 poles on the proper course from the stone that apparently marked the second corner the surveyors discovered a mound which they regarded as evidence that a tree had once stood at that point and had fallen leaving no other trace of its location, and this they took as the third corner. Nor did they find the "sugar" called for as the fourth corner, which with the chestnut oak last referred to likewise constitute the southern corners of defendants' farm, but the courses and distances as run brought the line back to the place of beginning. Such was substantially the showing made on behalf of plaintiffs, according to their testimony.

C. C. Sharp, county surveyor, acting on behalf of defendants, accompanied Thorn, Taylor and Wolfe along part of the line run by them from the white oak to the western line of the Terrason survey in searching for the black oak corner, though he was not present when they determined its location. But later he selected as a starting point of a survey made by him for defendants a location for the black oak about five rods, or probably more (the maps show eighteen rods), south of the spot where plaintiffs' surveyors had stood when they said Daniel Roberts pointed out to them the place where the tree had been, as he remembered it. Thereby Sharp brought his location nearer than theirs to the point where the trial line previously run by them had intersected the western line, for the location which they had determined upon for the black oak was about 16 rods north of that trial line. From the point so selected by him

Sharp ran a line on an angle of 58¾ degrees to a white oak stump located about eight rods south of the stone which Thorn and his associates had determined to be the Roberts corner. This stump he fixed upon as the actual position of that corner, regarding it as the white oak called for in the original deed from Wine to William Roberts as standing in the base line between lots 9 and 10 of the Smith plat. But, like plaintiffs' surveyors, he failed to extend his line to see whether it would strike the white oak standing at the extreme eastern end of the division line.

The variation from the course laid down by Smith in 1839 finally accepted and acted upon by Thorn, Taylor and Wolfe differed from Sharp's by half a degree. In other words, while the degree noted on Smith's plat was N. 63½ W. and the course used by Thorn and others was N. 58¼ W., that followed by Sharp was N. 58¾ W., the distance between the corners being the same in each instance of course. Allowing a variation of three minutes a year, said by witnesses to be an approximately correct estimate, or four degrees in 80 years, the difference in time, lacking three years, between the dates of the earliest and most recent ascertainment of the same line, it is apparent that the course adopted by Sharp is more nearly correct than the degree accepted by Thorn and his associates.

There is also this further disparity between the work done by these respective surveyors and their efforts to verify, test and establish the accuracy of their delineation on the ground and plats. In each of five deeds, Roberts to Crislip, dated July 7, 1855; Crislip to Perkins dated May 4, 1857; Perkins to Crislip, dated December 2, 1865; Crislip to Wiseman, dated April 23, 1901; and from Wiseman to defendant McCoy, dated May 6, 1914, all of which were admitted in evidence as links in the chain of title to the land involved, there is a call for a gum tree as corner of the northern and western lines of the 200 acres owned by defendants and likewise of the 400 acres out of which that tract and the 50 acres owned by plaintiffs were carved. All the deeds mentioned call specifically for that tree as a corner, but the earlier ones erroneously state the distance from the gum to "Roberts corner" as 130 rods, whereas measurements and the later deeds clearly indicate that 160 rods is the correct distance; and

that such is the fact seems to be conceded by all the surveyors. Though standing, thoroughly established and well marked and admitted to be in the line northward from the Roberts corner, Thorn and his associates found the distance from the Roberts corner as located by them and marked "stone" to the gum to be only 152 rods, and therefore disregarded it as a corner tree, treating it only as a line tree, and extended the line 8 rods beyond the gum into lands owned by another. On the other hand, a line from the Roberts corner as established by Sharp at the white oak stump to the gum approximates 160 rods in distance, the 8 rods extension found necessary by Thorn and others constituting the distance between the two locations of the Roberts corner. In other words, adopting the corner as located by plaintiffs' surveyors, it is necessary to disregard the calls in the five deeds just referred to making the gum a corner tree, and extend the western line of the Wiseman tract 8 rods into what appears to be land owned by another; whereas from the white oak stump chosen by Sharp as the Roberts corner the distance called for terminates at the gum and constitutes it a corner. At any rate there is such conflict between the two surveys in this and other respects as gives to the verdict of the jury peculiar force and conclusiveness.

We have already referred to the lines run by Thorn, Taylor and Wolfe from monuments known to all and called for in the various deeds to test the validity of the base line as determined by them. Sharp likewise supports his location of the line by known monuments, among others, a white oak stump which serves as the western corner of L. C. Bailey's land, and a second white oak stump constituting a corner to his land and that of O. M. Bowyer, both called for as corners in their respective deeds. Farther to the east is a walnut, and to the north is the gum referred to already. And as constituting additional proof tending to establish the correctness of his line, the Roberts corner as he determined it is represented by a white oak stump, which raises at least a presumption in his favor since that corner originally was designated as a white oak in the line common to lots 9 and 10 of the Terrason survey. There is also some testimony tending to show long recognition of the stump as a corner of the Suttle tract. Although, as we said, Sharp did not as

a test of its accuracy extend his line, eastward to ascertain if it would strike the white oak constituting the known eastern terminus of that line, and there is some testimony to support plaintiffs' contention that it would not, he vigorously asserts the contrary. But Thorn, Taylor and Wolfe likewise failed to run their line back to the distant white oak after locating the black oak at a point 18 rods north of the western terminus of their trial line.

All this merely serves to show the irreconcilable conflict between the two locations of the base line. Each has its points of strength and weakness. Whether the Sharp line or the Thorn line is the correct one we do not know and cannot say, but the jury may have believed Sharp and other witnesses whose testimony tends strongly to corroborate his position, and properly may have acted upon that belief, as probably they did so act, or they may have decided for defendants only because of the irreconcilable conflict in the proof touching the matter in controvery, the burden being upon plaintiffs to establish their right to take possession of the disputed area. W. F. Wilson, husband of one of the plaintiffs and father of the others and the active agent of all of them, frankly admitted the existence of a prolonged and continuous controversy concerning the true location of the lines and corners of the Suttle tract, and described as "only guess work" all former attempts to remove the uncertainty, and, although for years familiar with the land, affirmed his lack of definite knowledge where the line in dispute was. Certainly the evidence considered in its entirety furnishes no satisfactory or reliable basis for the solution of the vexatious problem. The conflict is of such a character that a verdict in support of either contention might have been proper and as such been sustained, if free from error destructive of or impairing its binding force and effect.

Did the trial court in ruling upon the admissibility of evidence commit such prejudicial error, as plaintiffs contend it did, as necessitates the award of a new trial? There are numerous assignments of this character, some of which need but little attention in this discussion. Though the witness Thorn was not permitted to state fully what he began to say Daniel Roberts "claimed" as to the location of the black oak corner at the west-

ern end of the division line between lots 9 and 10, Taylor and Wolfe without objection did state fully the conversation had between them and Thorn and Roberts on that subject, all of which Roberts speaking for defendants denied and confessed lack of knowledge on his part of the real position of the tree. Thus there was presented testimony sufficient to enable the jury properly to pass upon that question.

Plaintiffs sought over objection, sustained, to show that some of the defendants armed themselves with guns and acted "in a suspicious manner" while Thorn and his associates were surveying the Suttle tract, and refused to allow the survey to be made. If the fact was as the question propounded implied, it did not obstruct, delay or have any bearing upon the performance of the work done and completed at that time. Nor did Taylor's answers to questions propounded to him relative to the accuracy of the work so performed when considered in connection with farm line fences centering on the white oak stump ascertained by Sharp to be the Roberts corner prejudice plaintiffs. It was not erroneous to inquire of Sharp and McCoy what effect the line as run by plaintiffs' surveyors would have upon other corners and lines of lands adjoining or near to that tract and concerning the difficulty often experienced by competent civil engineers in tracing the lines of old surveys.

Though somewhat analogous, the facts of *Winding Gulf Colliery Co.* v. *Campbell,* 72 W. Va. 449, relied on by plaintiffs as authority supporting their contentions, are slightly different from those with which we are dealing. In so far as the principles of that case are applicable here they tend rather to sustain defendants' position, as appears from the point of the syllabus specifically cited by counsel which reads: "A line designated in a deed or other given muniment of title by its course and distance only must yield to an inconsistent marked line, run as the line intended by the parties; but if the deed calls for a line by monuments as well as by course and distance, such marked line not referred to in the deed must be ignored, if the monuments called for are ascertainable." Here one of the terminal monuments is not definitely ascertained, and surveyors have differed in their locations of it, with the result that the lines drawn between the termini likewise have varied, each being supported by certain

known monuments, thereby creating an ambiguity and uncertainty which it is the peculiar province of the jury to solve.

Nor is it readily perceivable in what way plaintiffs were prejudiced, if at all, by the affirmative replies of certain witnesses for defendant when asked if Wolfe had not substantially conceded the line run by him and others to be wrong. If true, the concession is material and proper for the jury to consider. But Wolfe denies it and explains his remarks by saying that he referred to other work done by him on a different occasion in the same neighborhood.

Much testimony was admitted over the objection of plaintiffs relative to the employment of Andrew Parks in 1914 to determine the boundaries of the Suttle tract. Though probably wholly irrelevant, so far as varying the calls of the deeds conveying such tract is concerned, the only apparent effect of this testimony was to show the employment of Parks to ascertain where these corners and lines were, as disclosed by the muniments of title, and not to vary them. There was no attempt to depart from the calls; merely to ascertain their location on the ground.

Several witnesses for defendants testified over objection that W. F. Wilson had pointed out the white oak stump in their presence as the true corner of the Suttle tract. Though testimony of this character probably is inadmissible to establish a line different from that called for in the deeds or to restrict the estate owned by his wife and children, the record shows that it was offered to impeach Wilson because of his denial, when asked the question on cross-examination without objection, that he had so recognized the stump as a corner of the farm. For that purpose the statements were admissible, the proper foundation therefor having been laid. *Morgan* v. *Franklin Insurance Co.,* 6 W. Va. 496; *Jaggie* v. *Colliery Co.,* 75 W. Va. 370.

Likewise there is no substantial merit in plaintiffs' contention that the court erred in permitting Andrew Parks, Lemuel McCoy and defendant W. M. McCoy to testify as to statements made to them by Cyrus A. Crislip, deceased husband of Margaret J. Crislip, the immediate grantor of plaintiffs and remote grantor of defendants, relative to his alleged dissatisfaction with the survey made by Parks in 1914. Plaintiffs urge that such

statements are inadmissible because in disparagement of the title which he has conveyed. It should be noted, however, that Cyrus A. Crislip in effect passed no title to the grantees, for he joined in the deeds only as husband of Margaret Crislip in whom the title was vested. But aside from that, this testimony was offered merely to impeach and contradict statements of Margaret Crislip and other witnesses for plaintiffs concerning conversations had with him relative to the same matter, and as such was properly admitted.

Nor was it error to exhibit to the jury in explanation of the testimony of defendant Harvey Miller a rough sketch or diagram drawn by him while making an examination of certain portions of the land in dispute, though the drawing was not introduced in evidence. It was not offered as independent proof of a fact to be established, but merely to explain and make clear to the jury the statements of the witness. *Hoge* v. *Ohio River R. Co.,* 35 W. Va. 562, 564; *State* v. *Harr,* 38 W. Va. 58, 63. See also *C. & O. Ry. Co.* v. *May,* 120 Va. 790, 798. In this respect it differs from the paper read to the jury in *Ward* v. *Salt & Coal Co.,* 79 W. Va. 371, 383, which was offered as direct proof of a fact concerning which the witness was testifying and not in explanation of his testimony.

For the foregoing reasons we affirm the judgment.

*Affirmed.*