**STATE of Maine**

v.

**Bernard DODGE.**

Supreme Judicial Court of Maine.

Feb. 8, 1979.

---

Michael E. Povich, Dist. Atty., Genevieve C. Stetson, Asst. Dist. Atty. (orally), Machias, for plaintiff.

Francis J. Hallissey (orally), Machias, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

McKUSICK, Chief Justice.

Defendant Bernard Dodge was convicted by a Washington County jury of assault with a dangerous weapon upon Victor Mahar. 17–A M.R.S.A. § 208(1)(B) (Supp. 1977).[1] Defendant has timely appealed from the Superior Court judgment entered on the jury's verdict. We deny the appeal.

From the record the jury would have been warranted in finding the following sequence of events. On the morning of Saturday, July 16, 1977, the victim of the alleged assault, Victor Mahar, was collecting rubbish along his usual weekend route in Pembroke. He made a routine stop at the residence of Mrs. Stella Carter, where he encountered an old school friend, Warren Carter. After a short conversation, Mahar continued on his route but with an invitation to come back later that afternoon to "shoot the bull for a while." That he did at about 3:00 p. m. Present at that time were Stella Carter (Warren's mother), Jeannette Eaton (Warren's girlfriend), Rita Rogers (his sister), and defendant Bernard Dodge (Mrs. Rogers' boyfriend), as well as Ed Owens, a friend of Mahar's. The group talked and drank into the evening, during which time defendant continually "needled" Mahar. At one point defendant threatened to push a clothesline pole through the windshield of Mahar's pickup truck.

At about 8:00 p. m., tempers having calmed, defendant and Warren Carter announced their intention to go for more beer. Mahar, stating he needed cigarettes, expressed a desire to go with them. Leaving his truck at Mrs. Carter's, Mahar, defendant, and Warren Carter left in defendant's car. After making their purchases, they went on to defendant Dodge's house in Dennysville, a neighboring town. There they congregated in the kitchen, which overlooks the driveway. A short time later, Mahar's pickup pulled into the driveway.

1. 17–A M.R.S.A. § 208 (Supp.1977) states in part:

"1. A person is guilty of aggravated assault if he intentionally, knowingly, or recklessly causes:

"B. Bodily injury to another with use of a dangerous weapon; . . .."

Concerned that someone was driving his truck without permission, Mahar left the house and headed toward the truck. Identified by Mahar in the driver's seat was Rita Rogers, who was accompanied by at least one other person. Before he could reach the truck, however, Mahar was wounded in the leg by a single shot fired from behind and to the left of him. He immediately slumped to the ground. A few moments later defendant appeared above him and stated, "How in hell can I shoot a man when I'm firing in the ground." At the same time, several other persons, including Stella Carter, who apparently arrived with Rita Rogers in Mahar's truck, were berating defendant for shooting Mahar. As a result of the gunshot, the lower third of Mahar's leg was subsequently amputated.

## I. *Admissibility of Civil Complaint and Interrogatories*

At trial, defense counsel sought to question Mahar on the substance of his complaint and his answers to defendant's interrogatories in a civil suit in which Mahar sought damages from defendant for the injuries sustained in the shooting. The defense's purpose was apparently to elicit from Mahar, for purposes of impeachment, both the fact that the complaint alleged, in the alternative, that defendant had "negligently handled [the] firearm," [2] and the fact that Mahar had denied in his answers to the interrogatories any knowledge of who had shot him. The State, however, raised a timely objection on the grounds that the pleadings and interrogatories in the civil action were irrelevant to the criminal action. At least partially agreeing, the presiding justice precluded defense counsel from eliciting testimony on any aspect of the civil action, save certain answers by Mahar to the interrogatories.

We note at the outset that defendant has failed to provide us on appeal with a copy of either the complaint or the interrogatories and their corresponding responses. Such an omission severely hampers our review of the issues attempted to be raised for appellate review. *See State v. Lang*, Me., 396 A.2d 1012 (1979); *State v. Woodward*, Me., 383 A.2d 661, 663 n. 2 (1978). In any event, we see no error in the trial justice's ruling. The fact (which we assume without having seen the civil complaint) that Mahar's attorney in that initial pleading based his civil claim on three alternative grounds, one of which (negligence) would not support criminal liability, was, at best, of dubious relevance. *Cf. McCormick v. Kopmann*, 23 Ill.App.2d 189, 203, 161 N.E.2d 720, 729 (1959) (alternative pleadings not admissible as admissions against interest). Rule 8(e)(2), M.R.Civ.P., permits alternative pleading, and any careful civil lawyer would include a negligence claim as well as one for an intentional tort, in order to protect his client against development at trial of the evidence along a line different from the facts as related to him by his client. In the related criminal case, no particular inference can be drawn from what any civil lawyer would plead as a matter of course. In the particular circumstances with which he was presented, the trial justice acted within the scope of his permissible discretion in ruling the civil complaint irrelevant. *See State v. Morton*, Me., 397 A.2d 171 (1979); *State v. Gagne*, Me., 362 A.2d 166, 170 (1976).

Defense counsel *was* permitted to examine Mahar in regard to his sworn answers to the interrogatories, and defendant's only complaint on appeal is that the interrogatories themselves were not also admitted. Nothing in the record before us suggests that each answer standing alone was not entirely intelligible without reference to the corresponding interrogatory, and the presiding justice committed no error in excluding anything beyond the answers sworn to by the witness Mahar.

---

**2.** A finding by the jury consistent with that allegation would not have supported a conviction under 17–A M.R.S.A. § 208(1)(B), in that section 208 requires a defendant to act at least recklessly. See n. 1 above.

## II. *Impeachment by Prior Inconsistent Statements*

Defendant next asks us to resolve the more serious question of whether the trial justice erred in not rendering *in limine* a ruling denying the State the opportunity to impeach its own witnesses through the introduction of their prior inconsistent extra-judicial statements. The State argues that Rule 607, M.R.Evid.,[3] clearly permits such impeachment. *See State v. St. Germain*, Me., 369 A.2d 631 (1977). Defendant, on the other hand, contends that notwithstanding the language of Rule 607, the trial justice should have, pursuant to Rule 403, M.R.Evid.,[4] excluded the evidence on the ground that its probative value was outweighed by its highly prejudicial effect. More specifically, defendant argues that the jury was unable to distinguish between impeachment evidence, admissible solely for the purpose of attacking a witness' credibility,[5] and substantive evidence, admissible to prove a party's case-in-chief.[6] Such a situation, posits defendant, enhanced the possibility that the jury erroneously relied on impeachment evidence as part of the proof of defendant's guilt.

■ A determination that the danger of unfair prejudice substantially outweighs the probative value of relevant evidence, thereby requiring its exclusion, is one within the sound discretion of the presiding justice. *See State v. Clough*, Me., 391 A.2d 361, 362 (1978); *State v. Saucier*, Me., 385 A.2d 44, 47 (1978); *see also* Field and Murray, *Maine Evidence*, Advisers' Note to Rule 403, at 59 (1976). As to the prior inconsistent statements, the admissibility of which was here in issue, the probative value that the presiding justice could consider on one side of the Rule 403 balance consisted solely in their tendency to impeach the credibility of the witnesses who allegedly had previously made them. The danger of *unfair* prejudice, which the presiding justice had to consider on the other side of the Rule 403 balance, arises from the risk that the out-of-court statements which inculpated defendant in the shooting of Mahar would as a practical matter be used by the jury as substantive proof of defendant's guilt.

■ At the time defense counsel asked for a ruling *in limine*, the presiding justice had not heard the testimony of the witnesses, nor had he seen all of the statements the State intended to use. Therefore, rather than rendering a wide-ranging decision without sufficient background knowledge,

---

3. Rule 607, M.R.Evid., states merely that:
   "The credibility of a witness may be attacked by any party, including the party calling him."

4. Rule 403, M.R.Evid., reads in part here pertinent:
   "Although relevant, evidence may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." (Emphasis added)

5. The statements which the State sought to introduce were not admissible as substantive evidence because they did not fall within that class of statements which are not hearsay under Rule 801(d)(1), M.R.Evid. That rule requires that the prior inconsistent statement, to be nonhearsay, have been "given under oath subject to the penalty of perjury at a trial, hearing or other proceeding, or in a deposition."

6. For comprehensive discussions of the problems surrounding the potential misuse of impeachment evidence to prove a party's case-in-chief, *see generally* Graham, *Employing Inconsistent Statements for Impeachment and as*

*Substantive Evidence: A Critical Review and Proposed Amendments of Federal Rules of Evidence 801(d)(1)(A), 613 and 607*, 75 Mich.L. Rev. 1565 (1977); Peeples, *Prior Inconsistent Statements and the Rule Against Impeachment of One's Own Witness: The Proposed Federal Rules*, 52 Tex.L.Rev. 1383 (1974). *See also* 3 *Weinstein's Evidence* § 607[06] (1978) (interaction of Rules 403 and 607).

For the manner in which the federal courts have dealt with the problem, *see United States v. Palacios*, 556 F.2d 1359 (5th Cir. 1977) (impeachment by prior inconsistent statement proper without a showing of surprise); *United States v. Morlang*, 531 F.2d 183 (4th Cir. 1975) (pre-Rules case prohibiting a party from impeaching its own witness where the procedure is used "as a subterfuge to get to the jury evidence otherwise inadmissible").

*See also Rhodes v. Harwood*, 273 Or. 903, 544 P.2d 147 (1975) (requiring that a party impeaching its own witness show both surprise and damage before testimony is admitted, unless the statement is classified as nonhearsay under Rule 801).

the presiding justice chose to allow the State to conduct its questioning, but with the cautionary instruction that "the mere fact that you have the right [to continue] means that you have to exercise that right very carefully. . . . I'm going to allow you to go into this, but that does not mean that I might not sustain every objection to every question you ask." We find no abuse of discretion in the adoption of such a procedure. On the contrary, the trial justice appropriately deferred his ruling until he knew exactly the circumstances under which the prior inconsistent statements were offered.

■ Defendant claimed both at trial and before this court that unfair prejudice arises particularly from what he claimed to be a pattern of conduct by the prosecution to seek to prove its case through friends and relatives of defendant who had made prior statements inculpating defendant, but who the prosecution knew would not repeat their stories on the stand. In the case at bar, however, we are not required to decide whether such a pattern of conduct existed here and, if so, whether the total impact of such pattern caused a danger of unfair prejudice to defendant substantially outweighing the prior statements' probative value for impeaching the witnesses. At trial the presiding justice admitted in evidence only one prior inconsistent statement—that of Warren Carter, the substance of which did support defendant's guilt—and the justice warned the jury of its limited use. At the time that statement was admitted in evidence through the police officer to whom it was allegedly made, the trial court promptly instructed the jury that "you are going to hear this for the purpose of determining whether the witness referred to is believable or not, and not for

the substance" of the prior statement. A similar limiting instruction was included in the general charge to the jury. The trial court committed no reversible error in admitting Warren Carter's prior inconsistent statement.

### III. *Instruction on Meaning of "Recklessly"*

■ As his third point on appeal defendant asserts that the trial justice erred in refusing to give defendant's proffered instruction on the definition of "recklessly," the state of mind necessary for a conviction under 17–A M.R.S.A. § 208(1)(B). Defendant sought to have the jury instructed that "negligence or even grossly negligent conduct does not constitute recklessness for the purposes of proving aggravated assault," and that "if you [the jury] believe Victor Mahar was shot by accident, you must find the defendant not guilty." The presiding justice, however, refused to give that charge and instead instructed the jury that:

"A person is guilty of aggravated assault if he intentionally, knowingly, or recklessly causes bodily injury to another with use of a dangerous weapon.

.    .    .    .    .

"[R]ecklessly is defined as being: A person acts recklessly with respect to a result of his conduct when he consciously disregards a risk that his conduct will cause such a result. And the disregard of the risk, when viewed in light of the nature and purpose of the person's conduct and the circumstances known to him, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would exercise—would observe in the same situation." The justice thus defined "recklessly" in the verbatim terms of the Code, 17–A M.R.S.A. § 10(3) (Supp.1977).[7] He committed no er-

---

7. Section 10(3) entitled "Recklessly" reads in full as follows:

"A. A person acts recklessly with respect to a result of his conduct when he consciously disregards a risk that his conduct will cause such a result.

"B. A person acts recklessly with respect to attendant circumstances when he consciously disregards a risk that such circumstances exist.

"C. For purposes of this subsection, the disregard of the risk, when viewed in light of the nature and purpose of the person's conduct and the circumstances known to him, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation."

ror by following the Code language in his charge to the jury. Similarly, the presiding justice committed no error in refusing to give defendant's proffered instructions, for they did not make an entirely accurate or complete statement of the applicable law, and they were likely to confuse or mislead the jury. *See State v. Melvin*, Me., 341 A.2d 376, 378 (1975); Glassman, *Maine Practice* § 30.2 (1967). For example, "accident" in the requested instruction could be taken to imply merely an absence of an intent to shoot Mahar; such an interpretation of "accident" would not exclude recklessness. ᵛ

■ Even though technically the trial justice's instruction, following the statute verbatim, cannot be faulted, defendant argues that the instruction was so confusing as to render it susceptible of misunderstanding by the jury. He would have the trial justice explain the legal terms to the jury to an extent going beyond the definitional language of section 10(3) of the Code. Specifically, defendant argues that the jury was unaware that it had to find that he *consciously* disregarded the risk of injury to Mahar in order to return a guilty verdict.

Although defense counsel made a timely objection to the instruction defining "recklessness," he made no objection before the trial court to the effect that merely reading the statutory definition of "recklessly" was confusing to the jury. In fact, defense counsel even failed to brief this contention on appeal and waited until oral argument before this court to raise it for the first time. Given these circumstances, our review is limited to the question of whether the instruction was so inadequate and misleading as to leave the jury without judicial guidance essential to its task, thereby constituting manifest error. *See* Rule 52(b), M.R.Crim.P. We think not.

Statutory language may of course be so incomplete or so unclear to laymen that "[n]o jury could reasonably be expected to be *made aware* of the legal principles involved in the controversy it was called upon to decide from a mere reading of the stat-

ute." *See Wing v. Morse*, Me., 300 A.2d 491, 502 (1973) (comparative negligence statute). The Code definition of "recklessly," however, does not fall into any such category of incompleteness or obscurity. We cannot say that any manifest injustice occurred in the case at bar that would justify reversal of defendant's conviction.

## IV. *Refusal of Mistrial for Alleged Jury Coercion*

Defendant finally asks us to reverse his conviction on the grounds that the trial justice erred by failing to declare a mistrial when it became apparent that the jury was having trouble reaching a verdict. As evidence that the final verdict was tainted by coercion, defendant points to the fact, noted by the court reporter in the transcript, that one of the jurors began to cry after the verdict had been announced and the jury polled.

The jury commenced its deliberations at 3:45 p. m. on the fourth day of trial. At 7:00 p. m. the trial justice sent the following note to the jury: "Do you need something else, or are you deadlocked and unable to reach a verdict?" The jury responded that due to the lack of evidence they could not reach a verdict at that time. At 8:00 p. m. the jury sent word that they were deadlocked.

■ Upon receiving notice of the jury's predicament, the trial justice sought advice of counsel, "Should I suggest to them that they give it one more try to see if they can resolve it, or what?" Defense counsel responded that he did not know, and the State indicated a wish that the jury try one more time. The following exchange then took place:

"THE COURT: . . . The last message we have is that you [the jury] are deadlocked. Is there any possible chance that if you were to discuss it a little more that there could be some chance that you might adjust your differences and—Do you want to give it another try?

"FOREMAN: Yes, there might be.

"THE COURT: Why don't we try it a little while longer and see if anything does develop. If you can, it would be appreciated. If you cannot come to an agreement, you cannot. Why don't you retire and let us know. Thank you."

Some twenty-five minutes later the jury returned a guilty verdict. Defense counsel then requested that the jury be polled. The entire transcript record of what then happened is as follows:

"(The jury is polled by the Clerk.[8] After the polling of the jury, Juror number 3 begins to cry)"

 Under these circumstances defendant contends the trial justice should have declared a mistrial. Completely lacking, however, is any indication that defense counsel ever moved for a mistrial, either at the time the jury was sent back or at the time it was polled. The record shows just the contrary, *i. e.*, that defense counsel's attitude was at most ambivalent in regard to the trial justice's decision to ask the jury to try one more time.

Furthermore, the trial justice's conduct falls well within the American Bar Association standards relating to jury trials, specifically approved by this court in *State v. White*, Me., 285 A.2d 832, 838 (1972). *See* ABA *Standards Relating to the Administration of Criminal Justice*, "Trial by Jury," § 5.4, p. 332 (1974). Of specific relevance here is section 5.4(b) of those standards, which states:

"If it appears to the court that the jury has been unable to agree, *the court may require the jury to continue their deliber-ations* and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals." (Emphasis added)

In the instant case, the trial justice went to considerable length to ascertain the opinions of both counsel and the jury foreman before sending the jury back. He further instructed the jury that if they could not reach a verdict, so be it.

In light of defense counsel's failure to move for a mistrial, the absence of any evidence tying the juror's crying to undue coercion, and the trial justice's obvious compliance with our decision in *State v. White, supra*, we are drawn to the inescapable conclusion that there was no error in the justice's failure to declare a mistrial.

## V. *Other Issues*

Defendant has raised several other issues on appeal. After careful consideration, we find none of them to be of merit.

The entry must be:

Appeal denied.

Judgment affirmed.

DELAHANTY, J., did not sit.

---

8. We strongly urge official court reporters to make a complete verbatim record of the results of polling of the individual jurors.