409 S.E.2d 181

**STATE of West Virginia**

v.

**Arthur Dale COLLINS.**

**No. 18795.**

Supreme Court of Appeals
of West Virginia.

June 22, 1990.

Dissenting Opinion of Justice Workman
Aug. 2, 1991.

J. Michael Anderson, Rainelle, William E. King, Lewisburg, for Arthur Dale Collins.

Roger W. Tompkins, Atty. Gen., Joanna I. Tabit, Asst. Atty. Gen., Charleston, for State.

MILLER, Justice:

The defendant, Arthur Dale Collins, was convicted of first degree murder by a Greenbrier County Circuit Court jury in May, 1987. He was sentenced to life imprisonment without mercy. The defendant assigns four primary errors: (1) the State's use of prior inconsistent statements by two witnesses, Tim Kelly and Lana Workman; (2) the failure to prove venue of the crime in Greenbrier County; (3) the involuntariness of the defendant's confession because he was not promptly presented before a magistrate; and (4) prosecutorial misconduct at trial. We find reversible error was committed in the use of the prior inconsistent statements; therefore, we reverse the defendant's conviction and remand the case for a new trial.

## I.

### FACTS

On April 26, 1984, the body of Sarah Marshall was found in a laurel thicket near

Mount Vernon Road in Greenbrier County. The body was fully clothed and covered by a quilt. The State Medical Examiner's office performed an autopsy on the body and determined that the cause of death was strangulation. In addition, the victim's head had been bludgeoned, which had caused severe fractures of the skull and hemorrhaging of the brain. In his report, the chief medical examiner, Irvin M. Sopher, M.D., estimated the date of death as April 24, 1984, but at trial, he testified that the date of death could have been considerably earlier.

After the body was identified, the state police began interviewing acquaintances of the victim. The police interviewed the defendant's sister, Lana Hudson;[1] Danny Workman; and the defendant's mother, Nadine Collins. All three witnesses gave statements.

The State's case revealed that Sarah Marshall was originally from Greenbrier County and had moved to the Washington, D.C. area in 1976. During the end of March, 1984, the victim and Rick Marshall[2] visited Ronceverte, West Virginia, and decided to move back on April 10, 1984. Shortly after returning to Greenbrier County, Sarah became reacquainted with Lana Workman, Danny Workman, and the defendant. Between April 10 and April 14, the victim, Rick, Danny, Lana, and the defendant spent a significant amount of time together partaking of marijuana, PCP, and alcohol.

On April 14, 1984, at approximately 7:00 p.m., the victim and the defendant left the victim's apartment to attempt to purchase some cocaine in Hinton, West Virginia. At Sarah's request, Lana stayed with Rick at the apartment to look after the victim's children. Sarah and the defendant drove to Hinton in Rick Marshall's 1969 Chevrolet.

At trial, the defendant's statement was introduced. In that statement, the defendant indicated that after he and the victim arrived in Hinton, he went into a bar and

asked where he might be able to buy cocaine. Some patrons in the bar said that there had been two black men in a van in town earlier in the day who were selling cocaine. The defendant then proceeded to another beer garden and was given the same information. Sarah and the defendant decided to wait in the car to see if the men in the van would return.

Approximately fifteen minutes later, a brown van pulled up in front of the second bar. According to the defendant's statement, after Sarah spoke with the men in the van, she returned to the car and told the defendant that the men had some cocaine to sell in their apartment on the west side of town. Sarah decided to go with the men to their apartment, and the defendant was to wait in the car until Sarah returned. When Sarah had not returned approximately two hours later, the defendant concluded that he had been abandoned and decided to drive to Virginia Beach, Virginia.

In his statement, the defendant said that he arrived at Virginia Beach about daylight and stayed there for two or three hours. While at the beach, the defendant picked up two hitchhikers who wanted to go to District Heights, Maryland, and because he had friends in that area, the defendant agreed to give them a ride. The defendant remained in Maryland until April 23, 1984, when he decided to go to Florida with two hitchhikers he met in Maryland. The defendant and one of the hitchhikers, Tim Kelly, arrived at Kelly's sister's apartment in Tampa, Florida, at approximately 2:00 a.m. on April 25, 1984.

## II.

## ADMISSIBILITY OF A PRIOR INCONSISTENT STATEMENT

### A.

#### 1.

*Rule 801(d)(1)(A) of the West Virginia Rules of Evidence*

In October, 1985, the police questioned Tim Kelly at his home in Elmira, New

---

1. By the time of the trial, Lana Hudson had married Danny Workman.

2. Apparently Rick Marshall is not related to the victim. Mr. Marshall was also known as Rick Lewis and Richard Laird Wheeless.

York, about any information he might have regarding Sarah Marshall's death. Although Mr. Kelly had been questioned by the police on several occasions in the past, this was the first time he gave any incriminating evidence against the defendant. In a sworn affidavit, Mr. Kelly stated that one evening, while he and the defendant were in Florida, they went to a bar. En route, the defendant told Mr. Kelly that the cops would probably be after him. Later in the evening, Mr. Kelly asked the defendant if he had killed his girlfriend. After hesitating a few minutes, the defendant admitted that: "Yeah, I killed her. But the only reason I did was before someone else got her."

At trial, Mr. Kelly recanted these earlier statements when called as a State's witness.[3] He testified that the defendant did not tell him he had killed Sarah Marshall. Mr. Kelly admitted that he had made the prior statement, but he explained that he had lied because the police had put him under extreme pressure. The prosecutor read portions of the prior statement into evidence and extensively questioned Mr. Kelly about the inconsistencies between it and his trial testimony. Defense counsel neither objected to the admission of the statement into evidence nor requested that the judge give a cautionary instruction to the jury.

■ There are two rules of evidence which apply to the use of a witness's prior inconsistent statement, i.e., Rule 607 and Rule 801(d)(1)(A).[4] Under Rule 801(d)(1)(A), a prior inconsistent statement is not hearsay and may be used as substantive evidence if it meets certain prerequisites. First, the statement must have been "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." Second, the statement must be inconsistent with the witness's testimony at trial, and the witness must be subject to cross-examination.[5]

Prior to the adoption of Rule 801(d)(1)(A), we considered whether a prior inconsistent statement could be used as substantive evidence in *State v. Spadafore*, 159 W.Va. 236, 220 S.E.2d 655 (1975). In *Spadafore*, we acknowledged that we had in the past adhered to the "orthodox rule," which prohibits the use of prior inconsistent statements as substantive evidence:

"The orthodox rule with regard to prior inconsistent statements is that such statements cannot be accorded any value as substantive evidence. The reasoning which justifies this rule is that a prior out-of-court statement has not been made in the presence or hearing of the party against whom it is sought to be used and was not elicited under circumstances which permitted exploration of the witness's perception, memory, or prejudice. Therefore, under the orthodox rule, the only authorized use of a prior statement is to neutralize contrary testimony at trial. *Jaggie v. Davis Colliery Co.*, 75 W.Va. 370, 84 S.E. 941 (1914); *Wilson v. McCoy*, 86 W.Va. 103, 103 S.E. 42 (1920); *State v. Carduff*, [142 W.Va. 18, 93 S.E.2d 502 (1956)]." 159 W.Va. at 246, 220 S.E.2d at 661.

---

3. It appears that the prosecutor knew that Mr. Kelly was going to recant portions of his earlier statement when he testified at trial.

4. No issue is raised as to W.Va.R.Evid. 613, which relates to the procedure for using a prior statement to impeach a witness. This rule modified the common law foundation rule. *See* F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 4.2(B) (1985).

5. W.Va.R.Evid. 801(d)(1)(A) provides:
  "The following definitions apply under this article:
      * * * * * *
  "(d) *Statements Which are not Hearsay.*—A statement is not hearsay if—

"(1) Prior Statement by Witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition[.]"

We also pointed out in *Spadafore* that courts have followed the orthodox rule "because of the inherently questionable nature of prior statements, particularly those made to police officers under coercive circumstances." 159 W.Va. at 246, 220 S.E.2d at 662.

At the time *Spadafore* was decided, there was substantial criticism of the orthodox rule, and we also recognized the rule's limitations. Accordingly, we traced the evolution of Rule 801(d)(1)(A) of the Federal Rules of Evidence, upon which our rule is patterned. This provision permits a witness's prior out-of-court statement to be offered for the truth of the matter asserted if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition[.]" In *Spadafore,* we decided to abandon the orthodox rule, and, in effect, we adopted Federal Rule 801(d)(1)(A) in Syllabus Point 1:

> "In a criminal case prior out-of-court statements made by a witness cannot be admitted into evidence for the truth of the matter asserted unless they were made under oath in a judicial atmosphere during the taking of a deposition or at a former trial and were subject at that time to cross-examination by the opposing party's counsel."

In 1985, with our ratification of the West Virginia Rules of Evidence, we adopted the federal rule, thus confirming our holding in *Spadafore.*[6] *See State v. McPherson,* 179 W.Va. 612, 371 S.E.2d 333 (1988). Our rule, derived as it is from the federal rule, aligns us with the federal courts' interpre-

tations of Rule 801(d)(1)(A). *E.g., United States v. Livingston,* 661 F.2d 239 (D.C.Cir. 1981); *Martin v. United States,* 528 F.2d 1157 (4th Cir.1975); *United States v. Day,* 789 F.2d 1217 (6th Cir.1986); *United States v. Micke,* 859 F.2d 473 (7th Cir.1988). *See generally* E. Cleary, *McCormick on Evidence* § 251 (3d ed. 1984); 4 J. Weinstein & M. Berger, *Weinstein's Evidence* § 801(d)(1)(A)[01] at 801–102, *et seq.* (1988 & Supp.1989).

Moreover, a majority of state courts have either adhered to the orthodox rule or have modified it as we have to permit a few limited exceptions. *See, e.g., Varner v. State,* 497 So.2d 1135 (Ala.Crim.App.1986); *Reynolds v. State,* 254 Ark. 1007, 497 S.W.2d 275 (1973); *State v. Butler,* 207 Conn. 619, 543 A.2d 270 (1988); *State v. Drapeau,* 97 Idaho 685, 551 P.2d 972 (1976); *People v. Gant,* 58 Ill.2d 178, 317 N.E.2d 564 (1974); *State v. Denis,* 384 So.2d 419 (La.1980); *State v. Franco,* 365 A.2d 807 (Me.1976); *Ali v. State,* 314 Md. 295, 550 A.2d 925 (1988); *Commonwealth v. Daye,* 393 Mass. 55, 469 N.E.2d 483 (1984); *People v. Hallaway,* 389 Mich. 265, 205 N.W.2d 451 (1973); *Moffett v. State,* 456 So.2d 714 (Miss.1984); *State v. Gomes,* 116 N.H. 113, 352 A.2d 713 (1976); *State v. Dick,* 27 Ohio St.2d 162, 56 O.O.2d 101, 271 N.E.2d 797 (1971); *State v. Isaac,* 477 A.2d 62 (R.I.1984); *State v. O'Brien,* 318 N.W.2d 108 (S.D.1982); *McFarlin v. State,* 214 Tenn. 613, 381 S.W.2d 922 (1964); *State v. Dragon,* 128 Vt. 568, 268 A.2d 913 (1970); *Williams v. Commonwealth,* 193 Va. 764, 71 S.E.2d 73 (1952). *See generally* Annot., 30 A.L.R.4th 414 (1984 & Supp. 1989).

The State, while acknowledging this weighty authority, urges us to follow the few jurisdictions that permit a prior incon-

---

**6.** We recognized in *State v. Clark,* 175 W.Va. 58, 331 S.E.2d 496 (1985), that *Spadafore* and, by inference, Rule 801(d)(1)(A) do not apply to a defendant's statement or confession because it is admissible as substantive evidence under W.Va.R.Evid. 801(d)(2)(A) as soon as its voluntariness has been established. In *Clark,* the defendant was impeached by his prior inconsistent statement and claimed that the court should have given, *sua sponte,* a limiting instruction. We held such an instruction was not required because the information contained in the defendant's prior statement was admissible as substantive evidence under W.Va.R.Evid. 801(d)(2)(A). As a consequence, W.Va.R.Evid. 607 on impeachment was not applicable as it relates to hearsay statements. In this case, we do not deal with a defendant's prior statement being used against him on the stand. Here, it is the witness, Mr. Kelly, who is being impeached by his prior statement.

sistent statement to be used as substantive evidence any time that the witness is available at the trial for cross-examination. These jurisdictions have, in effect, rejected the approach taken in Rule 801(d)(1)(A). In most cases, there are statutes or rules of evidence governing this issue. *E.g., State v. Allred*, 134 Ariz. 274, 655 P.2d 1326 (1982) (rule of evidence); *People v. Mulligan*, 193 Colo. 509, 568 P.2d 449 (1977) (statute); *Gray v. State*, 441 A.2d 209 (Del. 1981) (statute); *State v. Hobson*, 234 Kan. 133, 671 P.2d 1365 (1983) (statute); *State v. Woods*, 203 Mont. 401, 662 P.2d 579 (1983) (rule of evidence). Two states have judicially modified the orthodox rule. *Gibbons v. State*, 248 Ga. 858, 286 S.E.2d 717 (1982); *State v. Copeland*, 278 S.C. 572, 300 S.E.2d 63, *cert. denied*, 460 U.S. 1103, 103 S.Ct. 1802, 76 L.Ed.2d 367 (1983).[7]

We decline to accept the State's position. It would require us to overrule *Spadafore* and its progeny. It would force us to ignore the plain language of Rule 801(d)(1)(A) and the federal decisions based upon this provision. Moreover, it would allow a prior inconsistent statement to be used as substantive evidence regardless of the blandishments or inducements that were used to obtain it.

### 2.

### *Rule 801(d)(1)(A) Requirements*

■ The next question is whether Mr. Kelly's sworn statement to the police met the requirement under Rule 801(d)(1)(A) that a statement be "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition" to enable it to qualify as substantive evidence. In general, both federal and state courts have held that statements made to investigating officers, even if given under oath, fail to qualify under Rule 801(d)(1)(A), on either of the two grounds prescribed in the rule: First, the statement was not given subject to the penalty of perjury; and, second, the statement was not given at a trial, hearing, or other proceeding or in a deposition. *E.g., United States v. Livingston, supra* (sworn statements given to postal inspector); *Martin v. United States, supra* (co-conspirator's sworn statement to federal agent); *United States v. Day, supra* (defendant's statement given to Internal Revenue Service agent under oath); *United States v. Micke, supra* (audit investigation by IRS did not qualify as a proceeding under Rule 801(d)(1)(A)); *United States v. Dietrich*, 854 F.2d 1056 (7th Cir.1988) (witness's interview under oath to secret service agents); *United States v. Ragghianti*, 560 F.2d 1376 (9th Cir.1977) (statement to federal agent); *Delgado–Santos v. State*, 471 So.2d 74 (Fla.App.1985), *aff'd*, 497 So.2d 1199 (Fla.1986) (statement given under oath to police); *State v. Johnson*, 220 Neb. 392, 370 N.W.2d 136 (1985) (transcribed interview with witness in defendant's attorney's office).[8]

The reason courts are reluctant to include police interrogations within the meaning of "other proceeding" was aptly explained by the Florida court in *Delgado–Santos v. State*, 471 So.2d at 78:

"Investigative interrogation is neither regulated nor regularized; it contains none of the safeguards involved in an appearance before a grand jury and does not otherwise even remotely resemble

---

**7.** New Jersey has an evidentiary rule which forecloses the party who calls a witness from using the prior inconsistent statement as substantive evidence. It can only be used to impeach the witness if the judge finds the party was "surprised" by the witness's testimony. *State v. Ross*, 80 N.J. 239, 403 A.2d 457 (1979). Under this rule, the State could not have even used the prior statement to impeach Mr. Kelly inasmuch as it knew he had recanted the prior statement before he was called as a State's witness.

**8.** The only case we have found that holds otherwise is *United States v. Castro–Ayon*, 537 F.2d 1055 (9th Cir.), *cert. denied*, 429 U.S. 983, 97 S.Ct. 501, 50 L.Ed.2d 594 (1976), where the Ninth Circuit held that sworn tape-recorded statements given to border patrol police could be used as substantive evidence. The Ninth Circuit did add the caveat that "[w]e do not hold, as the question is not before us, that every sworn statement given during a police-station interrogation would be admissible." 537 F.2d at 1058. Scholars have criticized the holding in *Castro–Ayon* because it fails to discuss the "subject to the penalty of perjury" requirement in the rule. 4 Weinstein & Berger, *supra* ¶ 801(d)(1)(A)[01] at 801–105 to 801–107.

that process; and it has no quality of formality and convention which could arguably raise the interrogation to a dignity akin to that of a hearing or trial."

Accordingly, we hold that a prior statement of a witness, even if given under oath, during the course of a police interrogation is not a statement made "subject to the penalty of perjury" or during "a trial, hearing, or other proceeding" as required by Rule 801(d)(1)(A).

### B.

*Rule 607—Impeachment By Prior Inconsistent Statement*

Rule 607 of the West Virginia Rules of Evidence allows a party, including the one who called the witness, to impeach a witness with his prior inconsistent statement.[9] The State argues that impeachment of Tim Kelly was proper under Rule 607. We do not agree.

■ The right to impeach a witness under Rule 607 is not without its limitations. As we recognized in *State v. Kopa*, 173 W.Va. 43, 54, 311 S.E.2d 412, 423 (1983), Rule 607 broadened our prior rule, which was: " '[O]ne may not impeach his own witness absent entrapment, hostility or surprise.' *State v. Wayne*, [162 W.Va. 41, 44], 245 S.E.2d 838, 841 (1978)." (Citations omitted). However, we cautioned in *Kopa* "that the adoption of Rule 607 does not free either party to introduce otherwise inadmissible evidence into trial under the guise of impeachment." 173 W.Va. at 54, 311 S.E.2d at 423. (Citations omitted). *See* F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 4.3(A) (1985).

The admonition in *Kopa* is echoed throughout federal cases, typical of which is *United States v. Johnson*, 802 F.2d 1459, 1466 (D.C.Cir.1986), where the Court of Appeals stated:

"Impeachment evidence is to be used solely for the purpose of impeachment, and it may not be 'employed as a mere subterfuge to get before the jury evidence not otherwise admissible.' *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir.1975). *Accord United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir.1984); *United States v. Miller*, 664 F.2d 94, 97 (5th Cir.1981), *cert. denied*, 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982); *United States v. DeLillo*, 620 F.2d 939, 946 (2d Cir.), *cert. denied*, 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980); *Whitehurst v. Wright*, 592 F.2d 834, 839–40 (5th Cir.1979). This type of bootstrapping is impermissible, and it is 'an abuse of the rule, in a criminal case, for the prosecution to call a witness that it [knows will] not give it useful evidence, just so it [can] introduce hearsay evidence against the defendant....' *United States v. Webster, supra*, 734 F.2d [1191] at 1192 [7th Cir.1984]."

■ There is also general agreement that because impeachment by a prior inconsistent statement may not be employed as a mere subterfuge to get inadmissible evidence in front of the jury, a trial court has a duty to analyze the reason why a party wants to impeach its own witness. *E.g., United States v. Johnson, supra; United States v. Frappier*, 807 F.2d 257 (1st Cir. 1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1629, 95 L.Ed.2d 203 (1987); *United States v. Sebetich*, 776 F.2d 412 (3d Cir.1985), *cert. denied*, 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988); *United States v. Morlang*, 531 F.2d 183 (4th Cir.1975); *United States v. Dye*, 508 F.2d 1226 (6th Cir.1974), *cert. denied*, 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975); *United States v. Webster*, 734 F.2d 1191 (7th Cir.1984); *United States v. Peterman*, 841 F.2d 1474 (10th Cir.1988), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 774 (1989); *Balogh's of Coral Gables, Inc. v. Getz*, 798 F.2d 1356 (11th Cir.1986); *State v. Graham*, 200 Conn. 9, 509 A.2d 493 (1986); *State v.*

---

**9.** W.Va.R.Evid. 607 states: "The credibility of a witness may be attacked and impeached by any party, including the party calling him." Fed. R.Evid. 607 does not include the words "and impeached." It is clear, however, that the feder-

al courts allow the credibility of a witness to be attacked by impeachment with a prior inconsistent statement. 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 607[06] (1988).

*Hunt,* 324 N.C. 343, 378 S.E.2d 754 (1989); *State v. Marco,* 220 Neb. 96, 368 N.W.2d 470 (1985).[10]

A number of courts, both state and federal, have required the balancing test in Rule 403 of the Rules of Evidence to be used to determine whether impeachment evidence should be barred because its prejudicial effect outweighs its impeachment value.[11] *E.g., United States v. DeLillo,* 620 F.2d 939 (2d Cir.), *cert. denied,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980); *United States v. MacDonald,* 688 F.2d 224 (4th Cir.1982), *cert. denied,* 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983); *United States v. Webster, supra; Walker v. Lockhart,* 763 F.2d 942 (8th Cir. 1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3332, 92 L.Ed.2d 738 (1986) (applying Arkansas law); *Nitz v. State,* 720 P.2d 55 (Alaska App.1986); *State v. Beck,* 151 Ariz. 130, 726 P.2d 227 (1986); *Roberts v. State,* 278 Ark. 550, 648 S.W.2d 44 (1983); *Gross v. State,* 8 Ark.App. 241, 650 S.W.2d 603 (1983); *State v. Graham, supra; Wright v. United States,* 508 A.2d 915 (D.C.App. 1986); *State v. Robinson,* 561 A.2d 492 (Me.1989); *State v. Dodge,* 397 A.2d 588 (Me.1979); *State v. Hunt, supra; State v. Dickenson,* 48 Wash.App. 457, 740 P.2d 312 (1987); *State v. Thompson,* 142 Wis.2d 821, 419 N.W.2d 564 (App.1987), *review denied,* 143 Wis.2d 911, 422 N.W.2d 860 (1988).

In several cases, we have required the trial court to use the Rule 403 balancing test to prevent unfair prejudice to a defendant through the introduction of evidence of other crimes, wrongs, or acts. *E.g.,*

*State v. Hanna,* 180 W.Va. 598, 378 S.E.2d 640 (1989) (criminal acts); *State v. Banjoman,* 178 W.Va. 311, 359 S.E.2d 331 (1987) (prior misconduct); *State v. Dolin,* 176 W.Va. 688, 347 S.E.2d 208 (1986) (collateral crimes). Even before the adoption of Rule 403, we recognized its principle in *State v. McGee,* 160 W.Va. 1, 230 S.E.2d 832 (1976), *overruled on other grounds, State v. McAboy,* 160 W.Va. 497, 236 S.E.2d 431 (1977). In *McGee,* the defendant's credibility was impeached by evidence of his prior criminal conviction. In the Syllabus of *McGee,* we required the trial court to use a balancing test and to instruct the jury *sua sponte* as to the limited purpose of the evidence, i.e., impeachment:

> "When the State seeks to cross-examine a defendant in a criminal case regarding previous convictions for the purpose of testing his credibility, the trial court is required to consider the probative value thereof measured against the risk of substantial danger of undue prejudice to the accused and is further required to instruct the jury properly regarding the limited purpose of the question and the limited purpose for which the jury may consider it." [12]

Therefore, where impeachment of a witness is sought by way of a prior inconsistent statement under Rule 607, the trial court should use the balancing test in Rule 403 to determine whether to permit the impeachment. No such analysis was done in the present case.

Moreover, it is apparent from *McGee* that the trial court has an obligation

---

10. Courts consider a party's reason for impeaching its own witness because a prior statement, unless it qualifies as substantive evidence under Rule 801(d)(1)(A), is hearsay under Rule 801(c) and is inadmissible.

11. W.Va.R.Evid. 403 is identical to Rule 403 of the Federal Rules of Evidence and provides:

> "**Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay,

waste of time, or needless presentation of cumulative evidence."

Of course, impeachment testimony is offered to attack the credibility of a witness and is not offered for the truth of the matter asserted; thus, its probative value is not as substantial as that of substantive evidence under the Rule 403 balancing test.

12. Impeachment of a defendant's credibility by his prior criminal convictions was severely limited in *State v. McAboy,* 160 W.Va. 497, 236 S.E.2d 431 (1977), *modified in State v. Clements,* 175 W.Va. 463, 334 S.E.2d 600, *cert. denied,* 474 U.S. 857, 106 S.Ct. 165, 88 L.Ed.2d 137 (1985). *See* W.Va.R.Evid. 609(a)(1).

to instruct the jury that the impeaching testimony may only be considered as bearing on the witness's credibility and not as substantive evidence.[13] We adopted this rule in an analogous situation in Syllabus Point 3 of *State v. Caudill,* 170 W.Va. 74, 289 S.E.2d 748 (1982):

"In a criminal trial an accomplice may testify as a witness on behalf of the State to having entered a plea of guilty to the crime charged against a defendant where such testimony is not for the purpose of proving the guilt of the defendant and is relevant to the issue of the witness-accomplice's credibility. The failure by a trial judge to give a jury instruction so limiting such testimony is, however, reversible error."

*See also State v. Mullens,* 179 W.Va. 567, 371 S.E.2d 64 (1988).

Other jurisdictions are divided on whether a trial court must *sua sponte* give an instruction that evidence of a prior out-of-court statement used to impeach the witness's credibility cannot be considered as substantive evidence. Several courts have agreed with our position that such an instruction should be given by the trial court even in the absence of a request. *People v. McClure,* 779 P.2d 864 (Colo.1989); *People v. Wilson,* 43 Ill.App.3d 583, 2 Ill.Dec. 104, 357 N.E.2d 81 (1976); *State v. Whitfield,* 253 La. 679, 219 So.2d 493 (1969); *People v. Welch,* 16 A.D.2d 554, 229 N.Y.S.2d 909 (1962); *State v. Vargas,* 420 A.2d 809 (R.I.1980). *Cf. Channel v. State,* 592 P.2d 1145 (Wyo.1979) (failure to give cautionary instruction *sua sponte* regarding limited purpose of admission of defendant's prior conviction is reversible error). Other juris-

dictions, without discussing the *sua sponte* rule, have held that the refusal of an offered instruction on this point will constitute reversible error. *E.g., Brooks v. United States,* 448 A.2d 253 (D.C.App.1982); *People v. Dickerson,* 30 Mich.App. 447, 186 N.W.2d 850 (1971); *State v. Bottoms,* 260 S.C. 187, 195 S.E.2d 116 (1973); *Hall v. Commonwealth,* 233 Va. 369, 355 S.E.2d 591 (1987); *Irby v. State,* 60 Wis.2d 311, 210 N.W.2d 755 (1973). Finally, as we explain in the next section, several courts have addressed the question under the plain error doctrine.

### C.

### *Plain Error*

A number of courts have considered whether the failure to give a cautionary instruction is so prejudicial as to affect the substantial rights of the defendant. Our general test for "plain error" is in Rule 52(b) of the West Virginia Rules of Criminal Procedure.[14] As we observed in Syllabus Point 4 of *State v. England,* 180 W.Va. 342, 376 S.E.2d 548 (1988):

"The plain error doctrine contained in Rule 30 and Rule 52(b) of the West Virginia Rules of Criminal Procedure is identical. It enables this Court to take notice of error, including instructional error occurring during the proceedings, even though such error was not brought to the attention of the trial court. However, the doctrine is to be used sparingly and only in those circumstances where substantial rights are affected, or the truth-finding process is substantially impaired, or a miscarriage of justice would otherwise result." [15]

---

13. This is not inconsistent with *State v. Clark, supra,* where we held that impeachment of a criminal defendant by a prior inconsistent statement does not require a *sua sponte* limiting instruction because the prior statement is not hearsay, but is admissible substantive evidence under W.Va.R.Evid. 801(d)(2)(A). Consequently, W.Va.R.Evid. 607, dealing with impeachment through a prior statement which is hearsay, is not applicable, and a limiting instruction is not required. In this case, the witness, Mr. Kelly, and not the defendant, was impeached by his prior statement.

14. W.Va.R.Crim.P. 52(b) provides: *"Plain Error.* Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

15. In *State v. England, supra,* we made a uniform plain error rule which included Rule 30, which addresses plain error in the refusal to give an instruction, and the general plain error standard in Rule 52(b) of the Rules of Criminal Procedure.

Similar language can be found in Rule 103(d) of the Rules of Evidence.[16]

In *United States v. Sisto*, 534 F.2d 616 (5th Cir.1976), the Fifth Circuit addressed a situation similar to the case at bar where a prosecution witness testified about a prior inconsistent statement made by a key defense witness. After reviewing case law involving circumstances in which a trial court's failure to give a *sua sponte* cautionary instruction was plain error, the Fifth Circuit distilled the following general rule:

> "Plain error appears only when the impeaching testimony is extremely damaging, the need for the instruction is obvious, and the failure to give it is so prejudicial as to affect the substantial rights of the accused." 534 F.2d at 623, *quoting United States v. Garcia*, 530 F.2d 650 (5th Cir.1976). (Citations omitted).

"As the question implies, the plain error standard in this situation dictates reversal only if we are in doubt as to what the jury's verdict would have been had the proper instruction been given." *Sisto*, 534 F.2d at 624. Other federal courts of appeals, as well as state courts, adhere to this rule. *E.g., United States v. Johnson, supra; Jones v. United States*, 385 F.2d 296 (D.C.Cir.1967); *United States v. Hogan*, 763 F.2d 697 (5th Cir.1985), *rev'd on other grounds on reh'g*, 779 F.2d 296 (5th Cir.1986); *United States v. Lester*, 491 F.2d 680 (6th Cir.1974); *United States v. Lipscomb*, 425 F.2d 226 (6th Cir.1970); *United States v. Ragghianti, supra; United States v. Tavares*, 512 F.2d 872 (9th Cir.1975); *Gordon v. United States*, 466 A.2d 1226 (D.C.App.1983); *People v. Taglia*, 113 Ill.App.3d 260, 68 Ill.Dec. 879, 446 N.E.2d 1276 (1983).

There is no question that Mr. Kelly's prior statement that the defendant confessed to the killing was extremely damaging to the defendant's case. Indeed, the State had no other evidence which directly bore on the defendant's guilt.[17] This error was further compounded when the prosecutor referred to Mr. Kelly's prior inconsistent statements on several occasions during closing argument. In so doing, the prosecutor referred to the prior statements as substantive evidence rather than mere impeachment material. Courts have found this practice compounds the impeachment error. *E.g., United States v. Hogan, supra; United States v. Gilliam*, 484 F.2d 1093 (D.C.Cir.1973); *Everett v. State*, 530 So.2d 413 (Fla.App.1988); *People v. Robinson*, 189 Ill.App.3d 323, 136 Ill.Dec. 744, 545 N.E.2d 268 (1989), *appeal denied*, 129 Ill.2d 570, 140 Ill.Dec. 678, 550 N.E.2d 563 (1990); *Brown v. State*, 556 So.2d 338 (Miss.1990); *State v. Gordon*, 391 S.W.2d 346 (Mo.1965); *People v. Gale*, 138 A.D.2d 401, 525 N.Y.S.2d 685 (1988). Without Mr. Kelly's prior statement, the State's case was totally circumstantial, and we believe that the admission of it without a limiting instruction substantially impaired the truth-finding process. Even if we did not have a *sua sponte* rule, we conclude that the trial court committed plain error by not giving a cautionary instruction to the jury.

### D.

The State also sought to impeach another of its witnesses, Lana Workman, with her prior inconsistent statement.

---

**16.** W.Va.R.Evid. 103(d) provides: "Plain Error.—Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court."

**17.** The State's evidence against the defendant indicated that he was last seen with the victim in Hinton on April 14, 1984, the night she disappeared. When her body was found, she was wearing the same clothes she wore on that night. The quilt draped over the victim's body had been seen in the 1969 Chevrolet on April 14. This car was used by the defendant to drive the victim to Hinton and to leave West Virginia late in the evening of April 14. He called his mother in the early morning hours of April 15 to advise her to get his sister, Lana Workman, out of the victim's apartment where she was babysitting the victim's children. There was evidence that suggested the victim had ended her relationship with the defendant on the evening of April 14, 1984. A small amount of blood was found on the door frame, seat belt, and door vent of the 1969 Chevrolet which matched the victim's blood type, but the serologist testified that the blood could have been six months old. The defendant sold the 1969 Chevrolet to a junk yard after he arrived in Florida.

Defense counsel objected when the prosecutor first attempted to impeach Ms. Workman, but the trial court ruled that impeachment was proper under W.Va.R.Evid. 607.[18] The prosecutor impeached Ms. Workman by reading portions of a written statement she had given to the police on April 29, 1984. These portions outlined what her mother had told her about a telephone call the mother had received from the defendant on April 15, 1984.[19] This impeachment was brought about under the guise of claiming that the witness had not fully disclosed the contents of what the defendant had told her in a separate telephone call. Clearly, this "impeachment" by reading to her the earlier statement as to what her mother told her about a telphone conversation that the mother had had with the defendant was triple hearsay.

This impeachment accomplished several prejudicial points against the defendant. First, it indicated that the victim had broken off with the defendant, thus suggesting his motive for murder. Second, it provided the only geographic link of the defendant to the place where the body was found, which was outside of Talcott, West Virginia.[20] This point was emphasized by the prosecutor in his closing argument. Fi-

nally, the defendant argues in his brief that it was also done to inflame two black jurors because the mother's prior statement referred to black men as "niggers."

As discussed in Section II(B), *supra*, the right to impeach a witness under Rule 607 is not absolute. Impeachment cannot be used as a guise to bring in prejudicial and otherwise inadmissible evidence. Furthermore, before impeachment evidence is admissible, it is subject to the balancing test contained in Rule 403. In this case, the trial court did not balance the prejudicial effects of Ms. Workman's prior statement against its probative value.

A rather analogous situation existed in *United States v. Fay*, 668 F.2d 375 (8th Cir.1981), where a witness had told a friend that her daughter made a statement to her that she was going to fight the defendant. This witness was sought to be impeached by calling her friend to repeat the out-of-court statement. This impeaching witness was not permitted to testify, as the court found that her testimony would be hearsay within hearsay. She would be repeating the mother's hearsay statement which contained the daughter's hearsay statement. The appeals court held the impeachment was properly rejected.

18. Defense counsel did not renew his objection, but he is not required to do so under Syllabus Point 7 of *State v. Taylor*, 130 W.Va. 74, 42 S.E.2d 549 (1947), *overruled on other grounds, State v. McAboy*, 160 W.Va. 497, 236 S.E.2d 431 (1977):

"When an objection to evidence is distinctly made and overruled and an exception taken, the objection need not be repeated to the subsequent introduction of the same or similar evidence, unless it appears that such objection has been otherwise waived."

*See also Evalt v. United States*, 359 F.2d 534 (9th Cir.1966); *State v. Kanney*, 169 W.Va. 764, 289 S.E.2d 485 (1982).

19. The relevant portion of the statement as contained in the trial transcript is:

"Q Let me read this to you. This is what you told the police, is it not, that your mother had told you: Stated 'that [the defendant] was in Hinton and that Sarah had bought a lot of dope, and on their way out of Hinton they went through Talcott where Sarah stopped and picked up about five niggers. She told [the defendant] that he could get out and go wherever he wanted to.' 'She stated she was

going to do what she wanted to do, with who she wanted to. Sarah also said that she was going back to Maryland and get a pound of green and get in contact with Dexter.'

"Now, is that what he told you when he called in?

"A Yes.

"Q Then why did you just get through telling us this other story you told us?

"A He—Art had told my Mom, and my Mom had told me.

"See, all I know is that they went to Hinton, see. I don't know—I'm just going to say what I knew about this because you know, I don't know what he told Mom. I wasn't on the phone when he talked to Mom."

20. The defendant's statement given to the police and introduced by the State in its case-in-chief did not mention that the defendant drove through Talcott. The defendant's story was that he last saw the victim leaving in the brown van with two black men to obtain cocaine. At trial, the defendant's mother denied telling Ms. Workman that the defendant told her he had driven through Talcott.

In this case, the hearsay was even more compounded. Ms. Workman was impeached with her out-of-court statement to the police. The statement detailed a conversation that Ms. Workman had with her mother wherein Ms. Workman's mother relayed a telephone conversation she had had with the defendant. Included in the defendant's telephone call was further hearsay statements allegedly made by the victim.

A similar pattern was present in *United States v. Crouch*, 731 F.2d 621 (9th Cir. 1984), *cert. denied*, 469 U.S. 1105, 105 S.Ct. 778, 83 L.Ed.2d 773 (1985), where the government impeached its own witness with a prior statement the witness made to an F.B.I. agent, even though the government knew that the witness had repudiated the prior statement. In the prior statement, the witness said she received a telephone call from the defendant in which he implicated himself in the robbery for which he was being tried. The Ninth Circuit identified the statement as hearsay and, after acknowledging Rule 607, made this observation: "Nevertheless, courts have repeatedly emphasized that the government must not 'knowingly elicit testimony from a witness in order to impeach him with otherwise inadmissible testimony.'" 731 F.2d at 624. (Citations omitted). *See also United States v. Webster, supra.*

State courts have formulated similar rules and have concluded that when a prosecutor attempts to impeach a witness under Rule 607 as a guise to bring out damaging hearsay testimony, this is reversible error even though a cautionary instruction has been given. *E.g., Roberts v. State, supra; State v. Marco, supra.* In *State v. Hunt, supra*, the Supreme Court of North Carolina made an exhaustive review of the law in this area with particular emphasis on federal cases. In *Hunt*, the prosecutor impeached one of the State's chief witnesses with a prior statement the witness had given to the police. In the prior statement, the witness relayed a conversation she had with the defendant, which implicated the defendant in the murder. The North Carolina court recognized that the balancing test in Rule 403 should be utilized and

acknowledged, as we did in *Kopa*, the almost universal rule that impeachment cannot be done as mere subterfuge for introducing otherwise inadmissible evidence. On this sole ground, the court reversed the defendant's first degree murder conviction even though a cautionary instruction had been given.

■ In view of the foregoing, we find that the State's impeachment of its own witnesses was reversible error. In the case of Lana Workman, it was particularly egregious because of the multiple levels of hearsay.

### III.

### OTHER ERRORS

#### A.

*Prosecutorial Misconduct*

■ The defendant further claims that the prosecutor engaged in misconduct during his closing argument when he called four of the witnesses liars. We discussed this issue in some detail in *State v. England, supra*, where we pointed out that a prosecutor is not a mere partisan. To the contrary, he "assumes a quasi-judicial role and is required to set a tone of fairness and impartiality[.]" 180 W.Va. at 350, 376 S.E.2d at 556, *citing* Syllabus Point 3, in part, *State v. Boyd*, 160 W.Va. 234, 233 S.E.2d 710 (1977). We summarized several guidelines in Syllabus Points 7 and 8 of *England:*

"7. A prosecutor may argue all reasonable inferences from the evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

"8. 'It is improper for a prosecutor in this State to "assert his personal opinion as to the justness of a cause, as to the credibility of a witness ... or as to the guilt or innocence of the accused...." ABA Code DR 7–106(C)(4) *in part.*' Syllabus Point 3, *State v. Critzer*, 167 W.Va. 655, 280 S.E.2d 288 (1981)."

We also observed that "most cases reversed due to prosecutorial comment on

credibility involve other categorical assertions that a witness is lying or intimations of the prosecutor's personal belief or disbelief of particular witnesses." *State v. England,* 180 W.Va. at 351 n. 13, 376 S.E.2d at 557 n. 13. (Citations omitted).

In this case, the prosecutor, in his closing argument, on numerous occasions either directly stated that the witness was lying or intimated to that effect. For example, when referring to the testimony of Lana Workman, the prosecutor said: "Here's a very suspicious woman. Why lying— Lana—Lying Lana said she saw her that morning in this car with her feet upon the ground ..." We also find egregious the prosecutor's remark that "[y]ou know, Shakespeare once said—and I think he took this out of the Bible. He said, 'O, what tangled webs we weave when first we practice to deceive.' Thank God that criminals do that, so that we can tell what tangled webs they're weaving. And I am going to tell you right now, I saw at least three (3) people in this case—and probably, four (4) or more—that absolutely thought the oath to tell the truth meant nothing at all."

■ We need not decide whether such statements amount to plain error because this case is being reversed on other grounds. *But see State v. Moss,* 180 W.Va. 363, 376 S.E.2d 569 (1988) (prosecutor's remarks during closing argument so egregious that they constituted plain error). *See also Wilson v. People,* 743 P.2d 415 (Colo.1987) (prosecutor's comments that defendant's wife lied at trial constituted plain error). Moreover, the fact that a witness may be impeached by a prior inconsistent statement or gives testimony at variance with the State's witnesses does not give the prosecutor the absolute right to brand the witness a liar in his closing argument.

### B.

### *Proof of Venue*

■ The defendant also asserts that the State failed to prove venue. In Syllabus Point 5, in part, of *State v. Burton,* 163 W.Va. 40, 254 S.E.2d 129 (1979), we held that "[t]he State in a criminal case may

prove the venue of a crime by a preponderance of the evidence[.]" Moreover, venue does not need to be established by direct testimony, but can be proved by circumstantial evidence. *Burton,* 163 W.Va. at 58, 254 S.E.2d at 140.

■ The evidence at the defendant's trial sufficiently met this standard. The victim's body was found in Greenbrier County. The chief medical examiner testified that the cause of death was strangulation by a shoe string. Located at the scene were the victim's shoes, one of which had the shoe string missing. The shoe string used to strangle the victim and the shoe string found in the other shoe matched. This evidence, coupled with the medical examiner's testimony, sufficiently proved that venue was proper in Greenbrier County.

### C.

### *Prompt Presentment*

■ Finally, the defendant claims that the police did not promptly present him before a magistrate following his arrest. As we stated in Syllabus Point 4 of *State v. Humphrey,* 177 W.Va. 264, 351 S.E.2d 613 (1986):

"Ordinarily the delay in taking an accused who is under arrest to a magistrate [or neutral judicial officer] after a confession has been obtained from him does not vitiate the confession under our prompt presentment rule."

As aptly summarized by the Rhode Island Supreme Court in *State v. Johnson,* 119 R.I. 749, 756–57, 383 A.2d 1012, 1117 (1978), and quoted with approval in *State v. Humphrey,* 177 W.Va. at 270, 351 S.E.2d at 618:

" 'In short, delay, if it is to render a confession inadmissible, must have been operative in inducing the confession, and obviously only the detention that precedes a confession can have that effect. *See United States v. Mitchell,* 322 U.S. 65, 70, 64 S.Ct. 896, 898, 88 L.Ed. 1140, 1143 (1944); *United States v. Seohnlein,* 423 F.2d 1051, 1053 (4th Cir.1970); *Bailey v. United States,* 117 U.S.App.D.C.

241, 243–45, 328 F.2d 542, 544–46 (1964); *State v. Traub,* 151 Conn. 246, 249–50, 196 A.2d 755, 757 (1963).' "

After arresting the defendant, the police transported him directly to police headquarters. The defendant waived his *Miranda* rights and then made a statement regarding his use of Rick Marshall's car, which had been reported stolen. Immediately thereafter, the defendant agreed to discuss the murder of Sarah Marshall. Once again, the defendant waived his *Miranda* rights and then gave a detailed statement regarding his whereabouts on April 14, 1984. At trial, the defendant testified that his statement was given voluntarily.

Any delay in presenting the defendant before a neutral judicial officer occurred after he had given his statement. In light of the foregoing, we find that any delay in presenting the defendant before a neutral judicial officer was not operative in inducing the defendant's statement, and, therefore, the trial court did not commit reversible error in refusing to suppress the statement.

## IV.

For the foregoing reasons, the judgment of the Circuit Court of Greenbrier County is reversed, and we remand the case for a new trial.

Reversed and remanded.

WORKMAN, Justice, dissenting:

On first glance, the majority opinion seems logically analyzed and well-written. One must look at the record in the case and actually read the cases relied upon, however, in order to see what a gloss job the majority has had to create in order to reach its desired result.

First, the opinion mischaracterizes the state's position when it says that the state urges that the prior statement of witness Kelly should have been admitted as substantive evidence. It is clear that the state's primary argument on this issue is that portions of the witness' prior inconsistent statement were properly admitted for impeachment purposes, *not* as substantive evidence.[1] It is equally clear that what transpired in this case was plain and simple impeachment of a witness through a prior inconsistent statement, a time-honored concept in the our judicial system.

Before discussing the law relating to use of prior inconsistent statements of witnesses as impeachment, it is necessary to expand on the facts, since the majority was skillfully selective in limiting the factual presentation to those which supported its desired result.

The majority implies that the state knew that witness Kelly was going to recant his prior statement and put him on the stand solely to get that statement in as substantive evidence under the guise of impeachment. Although the state may have known[2] that the witness would recant that very limited portion of his statement concerning the defendant's admission that he killed the victim, it is clear from a reading of Kelly's entire testimony that he still gave a great deal of other perfectly proper and clearly admissible direct evidence on behalf of the state. His direct testimony went on for some nineteen pages before the inconsistency occurred and included a great deal of testimony concerning the defendant's actions soon after the crime. The majority would suggest that the witness was placed on the stand for the sole purpose of permitting the jury to hear his recantation and then admitting the prior inconsistency as substantive evidence. The record shows otherwise.

Historically, a witness' in-court testimony can be impeached by a prior inconsistent oral or written statement, *State v. Price* 92 W.Va. 542, 115 S.E. 393 (1922); *State v.*

---

1. It is only the state's fallback position that West Virginia should join a growing number of jurisdictions which do allow a witness' prior inconsistent statement to be used as substantive evidence when the witness is available for cross-examination.

2. Although the majority states that the state "knew that Mr. Kelly was going to recant," there is nothing in the record to indicate clearly what the state knew with regard to what the witness would say in court or when they knew it.

*Hall,* 174 W.Va. 787, 329 S.E.2d 860 (1985). Generally, a prior inconsistent statement is admissible only for impeachment purposes and not for the truth of the matter asserted, and is not substantive evidence unless it complies with West Virginia Rule of Evidence 801(d)(1)(A). F. Cleckley, *Handbook on Evidence for West Virginia Lawyers,* § 4.2(B) (2d ed. Michie 1986).

A review of Kelly's entire testimony demonstrates his prior statement was used for impeachment. The following portion of Kelly's testimony illustrates the type of impeachment that occurred:

(By the prosecuting attorney):

Q: Now, you gave an affidavit up in New York, did you not, under oath concerning the events of the evening?

A: Yes.

. . . .

Q: And isn't it true in that affidavit you said, "A couple of days later on Friday evening on payday we were riding ten (10)–speed bicycles to a bar called the Silver Dollar in Tampa, Florida"?

A: Yes.

Q: You said, "when all of a sudden Collins said the cops would, 'probably be after me.' He then got real quiet. I didn't press him for what he meant." Is that true?

A: Yes.

Q: So it was on the bicycles going to the bar?

A: No.

Q: What you're saying is, you lied in your affidavit?

A: That's what I'm saying.

Q: Then it says that you spend about three (3) hours drinking. Is that true?

A: We spend many hours drinking, every night.

Q: And you said you was drinking beer and Art was drinking mixed drinks. Is that true?

A: Most of the time Art would have mixed drinks. I would drink beer.

. . . .

Q: And the affidavit, under oath, "I was playing pool and Art got drunk."

A: Right.

. . . .

Q: ... And you said, "on the way home I asked him did he kill his girlfriend and he didn't answer right away." That's what you told the police under oath in October of '85, isn't that correct?

A: That's right.

Q: "And about five (5) minutes he finally said 'Yea, I killed her. But the only reason I did was before someone else got her.'"

A: That's right.

Q: "I also remember that Art told me that his girlfriend had left a hotel of motel with a couple of niggers in the van, but he did not go into details about this." Is that correct?

A: That is correct.

. . . .

Q: Then you went on to say you really didn't believe it because he had been nice to you?

A: That's right.

Q: And now today you are going to say to the jury what you told them in October was all a lie, aren't you?

A: Yes, I am.

The same is true regarding witness Lana Workman. Witness Workman gave a statement to the police only three days after the victim's body was discovered and prior to the police having any evidence implicating her brother in the murder. During her questioning, the police showed her the quilt which covered the victim's body, and she stated she had observed the quilt earlier that day in Rick Marshall's 1969 Chevrolet, the same car in which the appellant fled after allegedly murdering Sarah Marshall. Three years later, once she appreciated the gravity of her brother's situation and the significance of the quilt's placement at the crime scene, witness Workman suddenly "remembered" that Rick Marshall had brought the quilt into the apartment after repairing a flat tire.

Pertinent portions of Ms. Workman's testimony demonstrate that impeachment was what transpired:

(By the prosecuting attorney)

Q: And what happened when you got back to the apartment then?

A: I believe that's when Art and Danny and Sarah, we were all there; and Art asked Rick if he wanted—the tire that he had repaired, he wanted to put back on the car, or it was flat or something. And Art asked him if he want to—if he wanted him to help him, and he said, "No, I can do it myself." And he used this blanket, this quilt here, to lay on the ground because he didn't want to get dirty. And after he used the quilt, after they were through—I believe they did help him—but, after they were through, he brought it back into the apartment and threw it beside the kitchen table.

Q: Now Lana, you never told the police any such story, did you?

A: No, sir, I didn't.

Q: And of course, nobody asked you did they?

A: No, they did not.

    . . . .

Q: Now isn't it the truth, that the blanket was used when the tire was taken off by Danny Workman, your now husband, and Rick Marshall, before you ever got there and took for repair—

Mr. Anderson: (interrupting) Your honor, I'm going to object. The question is leading, and it appears to be cross-examining his own witness.

    . . . .

Q: Let me ask you this: Did you give the State Police a statement about this case on the three (3) days after the body was discovered, on April 29th 1984?

A: I'm not sure of the date, sir.

    . . . .

Q: Can you dispute the fact that's when you gave a statement to them [on 4-29-84]? You did give one, didn't you?

A: Yes, I guess I did.

Q: (interrupting) Listen to me: whether you told the State Police on that occasion right after you had made the statement, "Now that I see the blanket the State Police has that was found on Sarah's body, it appears to be the same one I saw in Rick's car while I was with him." Did you say that?

A: Yes, I did.

Q: And did you not then say, "we drove straight back to the apartment. I would say this was about 6:00 p.m. on Saturday, 4-14-84." Did you not say that?

A: I guess I did say that.

Q: And did you not say, "when we arrived at the apartment no one was there"?

A: Well then, that's the way it was then.

Q: Did you not also say, "After twenty minutes about twenty minutes after we arrived at the apartment Sarah, Art and Sarah's two children arrived at the apartment"?

A: Okay, yes.

Q: "They had been at the apartment about fifteen (15) minutes when Sarah asked Rick, well, are you going to go to the market?' Rick said, 'Hell no, I'm not going to the'"—I'm sorry, "'the laundry'", "'Hell, no, I'm not going to the laundry this late'". Did you tell them that?

A: Yes, I did.

Q: That Sarah said, "well, I need to go to the store and get the baby some food, and I need some money". Did you not tell them that?

A: Yes, I did.

Q: Now where in this, anywhere, do you say anything about seeing Rick Lewis—Rick Marshall, Rick Weelas, whatever he is, bring the blanket back in the room after the tire has been changed?

A: I was under the influence of PCP, and I guess that I just—it didn't cross my mind.

Q: You are telling me, at the time on the 29th when you talked to the State Police, that you were under the influence of some kind of drug when you gave this statement?

A: No—not when I gave the statement. I'm not telling you that. That's not what I'm telling you.

. . . .

A: When the State Police was questioning me, I had written down my statement on a legal pad, and I did go over my statement, and everything I said in there is true. . . .

The court did state during the impeachment of Ms. Workman in the presence of the jury: "He has a right to Cross-Examine the witness because of her attitude, and he has a right to impeach the witness under Rule 607."

Finally, after dismissing the jury the court gave the following explanation as to why he allowed the prosecutor to impeach his witness:

> The Court: With respect to the objections that he was impeaching his own witness, Rule 607 says as follows: "Who may impeach the credibility of a witness, may be impeached by any party, including the party calling them." And she clearly, under the old Rule prior to the Rules of Evidence, could have been impeached because she has shown her hostility to the State and could have been impeached and Cross-Examined in that basis.

When all of Lana Workman's testimony is reviewed, it is obvious that the state was demonstrating the many inconsistencies between her prior statement and her testimony at trial in an attempt to impeach her credibility, to attack the integrity of her in-court-inconsistencies, and *not* solely to admit substantive evidence subversively.

The reasoning process the majority undertakes in order to determine this was not proper impeachment can only be characterized as mental gymnastics.

They first leap from the context of the impeachment of a witness by use of prior inconsistent statement into the context of a criminal defendant himself being impeached by use of prior crimes or wrongdoing. These are horses of a vastly different color.

The majority cites *State v. McGee*, 160 W.Va. 1, 230 S.E.2d 832 (1976), *overruled on other grounds, State v. McAboy*, 160 W.Va. 497, 236 S.E.2d 431 (1977) for the propositions that (1) a Rule 403 [3] balancing test should be used to determine whether impeachment evidence should be barred because its prejudicial [4] effect outweighs its impeachment value; and that (2) the trial court should instruct the jury *sua sponte* as to the limited purpose of the evidence, i.e. impeachment.

Using the *McGee* case as basis for its reasoning, however, is like comparing apples with oranges. In *McGee*, the defendant, appealing from his conviction for delivery of marijuana, argued that the trial court erred in allowing the defendant's credibility to be impeached by previous convictions. 160 W.Va. at 8–9, 230 S.E.2d at 836–37. This Court reversed, finding that the trial court erred in allowing the state to impeach the defendant in this manner. Further, this Court held in the syllabus that:

> When the State seeks to cross-examine a defendant in a criminal case regarding previous convictions for the purpose of testing his credibility, the trial court is required to consider the probative value thereof measured against the risk of substantial danger of undue prejudice to the accused and is further required to instruct the jury properly regarding the limited purpose of the question and the limited purpose for which the jury may consider it.

*Id.* 160 W.Va. at 9, 230 S.E.2d at 833.

Clearly, the impeachment of a criminal defendant himself through evidence of oth-

---

3. West Virginia Rule of Evidence 403 is identical to Rule 403 of the Federal Rules of Evidence and provides:

> Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

4. Interestingly, the majority always makes reference to weighing the *prejudicial* effect, as opposed to the *unfair prejudice* which the rule envisions. Obviously, a great deal of proper evidence is prejudicial. The factor to be balanced under Rule 403 is the danger of *unfair* prejudice.

er crimes or wrong-doing must be viewed differently than the impeachment of a mere witness by use of a prior inconsistent statement. The rules and case law relating to impeachment of criminal defendants as opposed to ordinary witnesses have historically treated the right to impeach a criminal defendant using other crime evidence in a much more limited and cautious manner. By way of analogy, for example, West Virginia Rule of Evidence 609(a) differentiates between a criminal defendant and an ordinary witness with regard to impeachment by use of prior criminal convictions in general.

As we stated in *McAboy*, 160 W.Va. 497, 508, 236 S.E.2d 431, 437, *overruled in part on other grounds, State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983).

> The difference between the two rules is measured by ultimate penalty arising from the possible prejudice. With a witness, the use of a prior conviction to impeach credibility may result in some loss of credibility in the eyes of the jury and attendant personal embarrassment. With the defendant, the prejudicial effort of a prior conviction may result in an unwarranted conviction.

Certainly, impeachment of ordinary witnesses with prior inconsistent statements should not enjoy the same level of caution and protection as the impeachment of defendants themselves.

Next, as to the Rule 403 balancing test, it must be recognized that one of the realities of a trial that the majority seems not to understand is that a trial judge, unlike an appellate judge, must during the course of a trial make many decisions and rule on many evidentiary objections without benefit of extensive legal briefs and months to ponder deeply. The Rule 403 balancing test is routinely performed by trial judges throughout a trial. It is an instinctive part of making evidentiary rulings, a mental process that becomes second nature to an effective trial judge. There is nothing in the rule which requires a hearing or findings of fact on every Rule 403 determination.

There is also absolutely nothing in the record to support the majority's conclusion that no such balancing test was performed. The trial judge had heard some nineteen pages worth of Kelly's direct testimony before the recantation of the earlier statement occurred. In the context of that testimony, it is not difficult to mentally perform the balancing test and to determine that the state was clearly entitled to impeach the witness with his prior inconsistent statement. Likewise, the witness in cross-examination by the defense counsel, was given full opportunity to explain the inconsistency, and the matter of his credibility became a jury issue.

It smacks of an ivory tower outlook to suggest that each time a trial court must weigh the probative value against the potential for unfair prejudice of evidence, that its failure to stop the proceedings and hold a hearing thereon proves that such a balancing test was not done.

The next really incredible leap the majority makes is to impose the requirement upon the trial court that it *sua sponte* instruct the jury regarding the limited purpose for which it may consider evidence of a prior inconsistent statement. In all our cases dealing with impeachment of ordinary (non-defendant) witnesses through prior inconsistent statements, no such requirement has ever been imposed.

Professor Cleckley in his *Handbook on Evidence for West Virginia Lawyers, supra* § 3.9(F) at p. 137, points out that

> If evidence is properly admissible for one purpose but not for another, or where testimony is admissible as to one party but not as to another, failure to ask for an instruction limiting the jury's consideration of the evidence to its proper sphere waives the contention that the jury improperly considered the evidence.

In addition, Rule 105 of the West Virginia Rules of Evidence provides

> When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, *upon request*, shall restrict the evidence

to its proper scope and instruct the jury accordingly. (emphasis added)

No request for such a limiting instruction was made in the instant case.

Furthermore, a general instruction regarding credibility and describing the nature of impeachment of witnesses was given by the court in its instructions at the close of the evidence, and a specific instruction was given at the time of Lana Workman's testimony.[5]

In *State v. Fellers*, 165 W.Va. 253, 267 S.E.2d 738 (1980), the State called a witness who had given an unsworn, written statement to a state trooper following the defendant's arrest and two weeks after the crime had been committed. The prosecutor moved to have the witness declared a hostile witness because her testimony at trial was inconsistent with the prior written statement. The prosecutor then asked the witness if she recalled making the written statement to the trooper, to which she indicated that she did not. The State then called the trooper to the stand and permitted the trooper, over the defendant's hearsay objections, to read a portion of the witness' prior statement to the jury. In upholding that decision, this Court held that the statements were not admitted as a ruse to introduce impermissible evidence, but instead were used only to contradict and neutralize the in-court statement made by the witness.

Later, in *Kopa*, 173 W.Va. at 43, 311 S.E.2d at 412, the Court addressed the propriety of allowing the prosecution to impeach its own witness with a prior inconsistent statement that was unsworn and which the prosecution knew would be refuted at trial. At the defendant's trial, his girlfriend recanted a portion of a statement she had previously made to the police. The trial court then permitted the prosecution

to impeach the witness' testimony with her prior inconsistent statement over the defendant's objection. The Court concluded that the trial court did not err when it allowed the prosecution to impeach its own witness with a prior inconsistent statement and limited the statement's value to the credibility of the witness.

One must admire the skillful manner in which the majority makes subtle mischaracterizations and then uses them as tiny little building blocks with which to construct major new principles of law. For example, the majority misstates the factual foundation of the *Spadafore* case. See *State v. Spadafore*, 159 W.Va. 236, 220 S.E.2d 655 (1975). From the majority opinion: "Prior to the adoption of Rule 801(d)(1)(A), we considered whether a prior inconsistent statement could be used as substantive evidence in *State v. Spadafore*." The reality: *Spadafore* dealt not with a prior *inconsistent* statement, but a prior statement which the witness claimed in court that he *could not remember*. In *Spadafore*, the witness did not testify in court in an inconsistent manner. He merely claimed he could not remember making the statement. The Court did go on to hold generally that trial judges should greatly circumscribe the extent to which such out-of-court statements are used, and concluded that there was an abuse of discretion because twenty-six separate statements incriminating the defendant were admitted into evidence.

Even under the *Spadafore* principles, however, the lower court in the instant case did not abuse its discretion in the use it permitted of the witnesses' prior statements. They were used sparingly to demonstrate the lack of integrity of the in-court testimony which was impeached.[6]

5. The jury was instructed that:
    You are the sole judges of the credibility of the witnesses and the weight of the evidence. As used in these instructions, the 'credibility of a witness' means the truthfulness or lack of truthfulness of lack of truthfulness of the witness. . . .
        . . . .
    If you believe that any witness in this case has knowingly testified falsely as to any mate-

rial fact, you may, after considering and weighing the testimony of such witness, disregard the whole of the testimony of such witness or give it or any part thereof, such weight and credit as you believe it to be entitled to receive.

6. According to F. Cleckley, *Handbook on Evidence for West Virginia Lawyers*, § 4.2(B) (2d ed. Michie 1986) at p. 163, evidence of prior

Since the majority focuses most of its attention on the issue of the admission of prior inconsistent statements as substantive evidence, that issue will also be examined briefly.

The modern weight of authority views cross-examination regarding prior inconsistent statements as being sufficient to overcome the dangers of hearsay. An instructive discussion of this issue appears in F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 4.2(B) (2nd ed. Michie 1986), at p. 166–167:

> Research regarding human memory indicates several advantages prior inconsistent statements have over trial testimony. Studies show that the ability to remember an incident declines as time passes. Witnesses are more prone to forget facts supporting propositions with which they disagree. Prior inconsistent statements also may be made before a motive for perjury has arisen and perhaps are less likely to be untruthful.

> An instruction to jurors to use a prior inconsistent statement only for assessing the declarant's credibility but not for the truth of the matter asserted is, at best, confusing. The repetitive effect the instruction has of calling attention to the statement probably cannot do other than highlight the matter in the minds of jurors, thereby making them more inclined to rely on the statement than to disregard it.

The weight of authority appears to reject the orthodox rule and to view cross-examination of the declarant at trial as sufficient to combat the dangers of hearsay. The Model Code of Evidence and the Uniform Rules of Evidence both allow inconsistent statements as substantive evidence, the inconsistent statement must have been made under oath, in a proceeding, and subject to the penalty of perjury—has been criticized for disregarding both the benefits of allowing inconsistent statements to be considered as substantive evidence and the adequacy of cross-examination of the witnesses at trial.

Nineteen American jurisdictions allow prior inconsistent statements of a witness to be used substantively where the witness is available for cross-examination. Other jurisdictions admit prior inconsistent statements as substantive evidence under other limitations. Only a handful now refuse to permit such statements to be used substantively. Experience in other jurisdictions has not taught that such practices result in abuse. When the declarant is available for cross-examination, enough of the dangers of hearsay and unreliability are absent to justify the substantive use of prior inconsistent statements in civil cases.

The law of evidence should not be a game to see how many angels can dance on the head of a pin, or a series of meaningless hoops that one must jump through while tossing all common sense to the wind. The principles governing evidence should be aimed at assuring that only evidence with indicia of reliability and integrity is heard by the trier of fact.

The United States Supreme Court took such a practical approach in *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) where the defendant was convicted of furnishing marijuana to a minor on the basis of evidence of prior inconsistent statements made by the minor both at the time of the preliminary hearing and to a police officer after the minor claimed at trial that he couldn't remember his previous statements. The Court was confronted with the issue of whether the defendant's constitutional right of confrontation was violated by use of the prior inconsistent statements as substantive evidence. *Id.* at 152, 90 S.Ct. at 1932. Specifically the Court in addressing the issue of whether the prior statement was given under oath stated:

> if the declarant is present and testifying at trial, the out-of-court statement for all practical purposes regains most of the lost protections. If the witness admits

---

inconsistent statements actually can be admitted extrinsically for impeachment purposes when a

witness claims not to remember a prior statement.

the prior statement is his, or if there is other evidence to show the statement is his, the danger of faulty reproduction is negligible and the jury can be confident that it has before it two conflicting statements by the same witness. Thus, as far as the oath is concerned, the witness must now affirm, deny, or qualify the truth of the prior statement under the penalty of perjury; indeed, the very fact that the prior statement was not given under a similar circumstance may become the witness' explanation for its inaccuracy—an explanation a jury may be expected to understand and take into account in deciding which, if either of the statements represents the truth.

*Id.* at 158–59, 90 S.Ct. at 1935.[7]

In this case, however, the trial judge would have needed a crystal ball to comport with what the majority would require. The majority opinion is a boon to the crimi-nal element. In the future, those individuals who fraternize with criminals—indeed even those who work in tandem with others in criminal pursuits—may safeguard against being called to offer testimony against a criminal defendant by doing two simple things: (1) give the police a true account of what you know about the crime and (2) be sure and let the prosecutor know you plan to recant before you take the stand. This decision will make honest criminal investigatory work more difficult than ever.

Based upon the foregoing, I dissent.

---

**7.** Specifically, the Court in *Green* upheld a California statute against an attack that the statute violated a criminal defendant's Sixth Amendment right to confrontation. The statute provided that evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with the testimony of the witness at the hearing and the witness is given an opportunity to explain or deny the prior statement. The *Green* case has been widely cited in subsequent federal and state decisions. The holding in *Green* was restated in *Kentucky v. Stincer,* 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987), for example, in which case the Supreme Court of the United States said: "In *California v. Green, supra,* the Court concluded that the confrontation clause was not violated by admitting a declarant's inconsistent out-of-court statement 'as long as the declarant is testifying as a witness and subject to full and effective cross-examination' at the trial itself." 482 U.S. at 737–738, 107 S.Ct. at 2662–2663.

Moreover, *Green* has been cited, generally, in several cases in this State. *State v. James Edward S.,* 184 W.Va. 408, 400 S.E.2d 843, 848 (1990); *State v. Edward Charles L.,* 183 W.Va. 641, 398 S.E.2d 123, 157 (1990); *State v. Schoolcraft,* 183 W.Va. 579, 396 S.E.2d 760, 764 (1990); *State v. Mullens,* 179 W.Va. 567, 371 S.E.2d 64, 67 (1988); *State v. Smith,* 178 W.Va. 104, 358 S.E.2d 188, 198 (1987); *Naum v. Halbritter,* 172 W.Va. 610, 309 S.E.2d 109, 114 (1983). In *Naum,* this Court stated: "We are aware that subsequent cases have made clear that the rule against hearsay and the Sixth Amendment guarantee of a right to confrontation are not entirely coextensive." 172 W.Va. at 615, 309 S.E.2d at 114.