**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**State of West Virginia,**
**Plaintiff Below, Respondent**

**v.)  No. 22-740** (Kanawha County 19-F-337 & 19-M-88)

**Gerard Maxwell,**
**Defendant Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Gerard Maxwell appeals the Circuit Court of Kanawha County's August 31, 2022, disposition order entered following his convictions for the felony offenses of first-degree murder and possession of a firearm by a prohibited person and the misdemeanor offense of domestic battery.[1] The petitioner claims evidentiary error, that the evidence was insufficient to support his convictions, that newly discovered evidence entitled him to a new trial, and fraud before the grand jury. Upon our review, finding no substantial question of law and no prejudicial error, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21(c).

On January 15, 2019, Marian Chapman (the "victim") was shot dead on the front porch of Markkeia Johnson's home. Approximately seven months later, the petitioner was indicted for the felony offenses of possession of a firearm by a prohibited person and the victim's first-degree murder. He was also indicted for the misdemeanor offense of domestic battery of the victim.

The petitioner moved to dismiss the indictment. He asserted that the lead investigator, Detective Howery of the Kanawha County Sheriff's Department, learned that the petitioner had been shot during the events leading to the victim's death, that the victim was known to carry a gun, and that shell casings that were the same caliber as the victim's gun were found at the scene. Because this information was not presented to the grand jury, the petitioner argued, the grand jury testimony was intentionally false, misleading, and "amounted to a fraud upon the grand jury." The circuit court denied the petitioner's motion without a hearing, finding that he had made no showing of willful or intentional fraud.

The petitioner waived his right to a jury trial and proceeded to a bench trial on December 6, 2021. Ms. Johnson, the owner of the home at which the victim was killed, testified that on January 15, 2019, Julia Mitchell, Amanda Mace, Ms. Johnson's daughter, the victim, and the

---

[1] The petitioner appears by counsel L. Thompson Price. The State appears by Attorney General Patrick Morrisey and Deputy Attorney General Andrea Nease Proper.

petitioner were at her home, with the petitioner having arrived in a "big white truck. . . . [A Ford] Excursion."[2] Ms. Mace confirmed that there was only one male present, whom she identified as the petitioner. Ms. Mitchell, too, said that "[t]here was one" male there.

Ms. Johnson testified that she went into her bedroom to roll a marijuana cigar, and the petitioner and the victim, who previously dated, came into her bedroom and began arguing. Ms. Johnson said that the argument between the victim and the petitioner escalated, and the petitioner grabbed the victim "by the throat and [was] choking her." He then "got to smacking" and punching the victim, who "wasn't really fighting, but you know, trying to block herself, defend herself." According to Ms. Johnson, the victim carried a gun; however, she did not see the victim with a gun on January 15. Ms. Johnson did see the petitioner wielding a gun in her bedroom, and the petitioner reportedly told the victim, "Bitch, I am going to kill you and your brother and ho ass cousin."

Mindful of her young daughter in the home, Ms. Johnson asked the petitioner to stop, but he was "already enraged." Once Ms. Johnson saw blood "coming from [the victim's] face," she grabbed her daughter and ran out the front door away from the home, without informing her guests of any perceived danger. Ms. Johnson and her daughter were approximately a block away when Ms. Johnson heard five gunshots, with a short pause between the second and third shots. Ms. Mace testified to hearing "a couple of gunshots and a pause and then there was a few more," after which she called 9-1-1.[3] Derek Vance, one of Ms. Johnson's neighbors, also called 9-1-1 after hearing "[p]robably five to six" gunshots. He further testified to seeing "a white SUV" leave the scene.

Detective Howery testified that the first report of shots fired came in at 6:26 p.m., and he testified to finding the victim's concealed weapon license in her purse at the scene. Detective Howery also found a Beretta Nano 9mm semi-automatic handgun, which had "a fired shell casing that was still in the chamber," rendering it inoperable until cleared. The Beretta's magazine contained six unfired 9mm Luger cartridges, and Detective Howery testified that the maximum capacity of the Beretta was "eight[] plus one," if "it was fully loaded, topped off." He also testified that blood was found on the porch, which was contained to one area "on the right hand side of the front porch to the right of the main entry door." First responders found the victim's body on the right side of the porch.

---

[2] Two additional women (Taylor McLaughlin and Selena Sutton) were at Ms. Johnson's home at some point during the day on January 15, but it does not appear that they were present at the time of the events culminating in the victim's murder.

[3] Ms. Mitchell denied seeing or hearing anything that night. She testified that she was leaving Ms. Johnson's home when she saw someone on the porch, so she instructed Ms. Mace to call 9-1-1. But "[a]fter that I don't know anything else," Ms. Mitchell claimed. Ms. Mitchell also initially denied being present at Ms. Johnson's to law enforcement because she "didn't think it was in [her] best interest to say [she] was there at the time because [she did not] know anyone." Ms. Mace, who lived with Ms. Johnson and remained in her room while Ms. Johnson and her guests conversed, denied hearing any altercation before the gunshots.

2

Officers later found an abandoned white Ford Excursion behind a convenience store. Security camera footage from that convenience store shows the Ford parking at 7:51 p.m. on January 15. A person exits the Ford and gets into a light-colored Jeep Grand Cherokee that arrived moments later, but the person's identity could not be determined due to the poor video quality and distance. The Ford was seized, and a paper towel containing what appeared to be blood—but not an amount that would be consistent with a gunshot wound—was found in the Ford's front middle console. DNA analysis of the paper towel resulted in a match to Bernard Johnson.[4] Detective Howery testified that he sought to interview Mr. Johnson, but Mr. Johnson refused to speak with the detective.

The petitioner did not remain at Ms. Johnson's home following the shooting, and he was not apprehended until March 8, 2019, near Atlanta, Georgia. He declined to provide a statement to Detective Howery, but, according to the detective, the petitioner showed him "some wounds" that were "still . . . healing."

Five spent cartridge casings were found at the scene (exclusive of the one found in the Beretta), on or near the porch; all were "determined to be of . . . a .45 caliber weapon," according to a crime scene investigator. During the victim's autopsy, the bullet from a gunshot to her abdomen that tore through her left lower lung—a "significant" injury that "would prove fatal," according to the medical examiner—was recovered. That bullet was determined to be consistent with the .45 caliber family. One fired bullet found at the scene was determined to be from the .38 caliber family, and most consistent with being a 9mm Luger.[5] But other bullet jackets and lead fired bullet cores found at the scene were determined to either have come from a .45 caliber family fired bullet or not have been consistent with a 9mm bullet. Gunshot residue was found on the victim's face, but not either hand. It was also found on the steering wheel and middle console of the Ford Excursion.

During the victim's autopsy, the medical examiner noted injuries to the left side of the victim's face (swelling and redness) and five gunshot wounds. All gunshot wounds had an upward trajectory. The medical examiner opined that the cause of the victim's death was multiple gunshot wounds, and the manner of death was homicide. "And in this case by an assailant wielding a large caliber handgun," the medical examiner added.

---

[4] The DNA profile generated from the paper towel was searched against a database of DNA profiles from samples typically collected by prisons called "CODIS." Mr. Johnson was matched through that CODIS search. The petitioner recalled Detective Howery during his case-in-chief, and Detective Howery explained that he did not seek a search warrant for Mr. Johnson's blood after learning of the CODIS match because he had not received any other information that Mr. Johnson was involved on the night of the murder. Also during the petitioner's case-in-chief, Joshua Haynes, a forensic scientist, testified that the petitioner was excluded as a contributor to the DNA on the bloody paper towel found in the Ford Excursion.

[5] No testing was completed to determine whether the bullet was fired from the Beretta 9mm found at the scene.

Timothy Elliott, a witness for the State, said that he was riding his bike near Ms. Johnson's home on January 15 when he observed "[j]ust two" people standing on Ms. Johnson's front porch, both with long hair, one of whom he recognized as the petitioner. Mr. Elliott testified that the petitioner was the "person being shot." Mr. Elliott acknowledged that, in his statement to the police following the murder, he said that the petitioner shot the victim. He explained that he "was a bit confused." The State further probed differences between Mr. Elliott's statement and his trial testimony, but the first objection from the petitioner came when the State asked, "Do you remember telling the law enforcement that you talked to, that the victim who ultimately died was gunned down on the porch by [the petitioner]?" The basis for the petitioner's objection was that "that's not what he said." The State rephrased, asking, "Do you remember telling law enforcement that the person shot on the porch and later died was shot by [the petitioner]." The petitioner lodged the "[s]ame objection," elaborating that the question "assumes facts not in evidence, that is a mischaracterization of his prior statement." The State responded, "Your Honor, that's what is on his statement. I am impeaching his statement." The State offered to play Mr. Elliott's statement, which drew no objection, and the court directed that to occur. After it was played, Mr. Elliott confirmed that he told police that he recognized the petitioner's face, that the petitioner had a gun and stood feet apart from the victim, that the petitioner fired the gun, that the victim fell, and that Mr. Elliott left the scene. But he testified that his "memory was backwards on the shooter" when he gave his statement, and he maintained at trial that the shooter was on the right side of Ms. Johnson's porch.

The petitioner's witnesses included Eugene Brown, Crystal Ford, and Amber Ferrell.[6] Mr. Brown, one of Ms. Johnson's neighbors, testified to seeing a short, thin man "talking, fussing with" a short, thin black female with long hair outside of Ms. Johnson's at approximately 5:00 p.m. on the evening of the shooting, but he denied seeing anyone who matched the petitioner's description.[7] Within a minute or two of hearing gunshots, Mr. Brown saw "a white SUV coming past the house." Mr. Brown testified that the passenger of that vehicle was the same short, thin black male he "heard fussing."

Ms. Ferrell, who has known the petitioner for more than twenty years, testified that the petitioner came to her house for about ten minutes on January 15. The petitioner told her, "I got shot," and Ms. Ferrell saw "[a]t least two, maybe four" wounds on his stomach and side, from which blood was "pouring out." Ms. Ferrell urged him to go to the hospital, but he "[s]aid he couldn't." Ms. Ferrell identified two friends or acquaintances who drove Jeeps. Ms. Ford, a friend of Ms. Ferrell's who was at Ms. Ferrell's when the petitioner showed up, heard the petitioner yelling on the phone and saw "two shots . . . in his stomach" that were actively bleeding.

---

[6] As indicated above, the petitioner also recalled Detective Howery, and Mr. Haynes, the forensic scientist, was a defense witness.

[7] Regarding the physical appearance of the petitioner and the victim, Detective Howery testified that the petitioner is 5'9" and weighs 230 pounds. The victim was 5'4" and weighed 164 pounds. The autopsy report states that "[t]he [victim's] body is of overweight habitus" and describes the victim's hair as "evenly trimmed to approximately [one] inch in length."

On January 6, 2022, the circuit court entered a "Final Verdict Order" finding the petitioner guilty of first-degree murder, possession of a firearm by a prohibited person, and domestic battery. Regarding first-degree murder, the court found that the petitioner "became enraged" with the victim "and began to hit, choke, and threaten to kill her while holding a handgun in Ms. Johnson's bedroom." The victim left Ms. Johnson's bedroom, and the petitioner "deliberately followed" her "to the porch with the premeditated intent of killing her." The court further found that the petitioner "willfully and intentionally shot [the victim] five times with the intent to kill her" and that the victim's death was caused by the five .45 caliber bullets he shot. The court also found that the petitioner "suffered two gunshot wounds during the altercation." Then, after shooting the victim, the petitioner "frantically left the scene in a white Ford Excursion and sped to Ms. Ferrell's residence." The court found that the petitioner's "refusal to seek medical treatment combined with abandoning his vehicle, and abruptly choosing to flee . . . to Atlanta, Georgia, . . . speaks to the [petitioner's] mentality of guilt for his actions." The court included a "conclusion of law" stating that Mr. Elliott "witnessed the [petitioner] holding a gun and standing feet apart from the other person. In his statement to the police, he stated that he saw the [petitioner] shoot [the victim]."

Regarding possession of a firearm by a prohibited person, the court noted that the parties stipulated that the petitioner was previously convicted of the felony offense of voluntary manslaughter, and it found that voluntary manslaughter is a crime of violence against the person of another. The court recited that Ms. Johnson observed the petitioner holding a handgun in her bedroom. It also found that Mr. Elliott "testified . . . that he saw the [petitioner] on the porch of Ms. Johnson's home with a handgun." The court noted that the firearm and toolmark evidence showing that the victim's gunshots were caused by a .45 caliber family was corroborative of the fact that the petitioner possessed a gun, as was the fact that the 9mm Beretta recovered at the scene could not have fired the .45 caliber bullet found in the victim's body. The court found Ms. Johnson's and Mr. Elliott's testimony "to be credible, in which, the [petitioner] was holding a gun at least twice the night of January 15, 2019." Accordingly, the court found that the State proved, beyond a reasonable doubt, that the petitioner committed the felony offense of possession of a firearm by a prohibited person.

Lastly, regarding domestic battery, the court recounted that, as testified to by Ms. Johnson, the petitioner and the victim were in a prior romantic/dating relationship, and the petitioner intentionally struck and choked the victim, causing her harm. Further, the medical examiner documented injuries to the left side of the victim's face. Therefore, the court found that the State proved, beyond a reasonable doubt, that the petitioner committed domestic battery.

The petitioner filed a motion for a new trial in January 2022. The petitioner argued again that the indictment resulted from a fraud upon the grand jury due to the State's failure to "present exculpatory material" and that "[t]rial testimony has exposed the fraud." In particular, the petitioner argued that trial evidence showed that he was shot first by the victim, and the "omission of this exculpatory information is the very definition of fraud." In an amended motion for a new trial, the petitioner added that the court plainly erred in relying on Mr. Elliott's statement to the police as substantive proof of the petitioner's guilt, as the prior statement could be used as impeachment evidence only. The court denied the petitioner's motions, finding that he had not established willful, intentional fraud in the grand jury testimony and that the court properly considered Mr. Elliott's credibility and the weight of his inconsistent statements. So, the court

continued, "the admission of Mr. Elliott's impeachment statement did not reach the level of plain error."

In May 2022 the petitioner filed another motion for a new trial, asserting that he had newly discovered evidence: an eyewitness to all shots fired. That witness—Bernard Johnson, whose blood was found on the paper towel in the Ford Excursion—provided a verified recorded statement stating that he met the petitioner (his cousin) at Ms. Johnson's house on the evening of the victim's murder, close to dusk. Mr. Johnson said he was accompanied by his girlfriend, Victoria See, but she waited outside while he socialized inside for approximately twenty minutes. Mr. Johnson claimed to have seen "some tall, skinny dude lingering around the corner" outside the fence surrounding Ms. Johnson's home, and when he left Ms. Johnson's home to go to the store with Ms. See, Mr. Johnson "still s[aw] the dude hanging around." After their trip to the store, on Mr. Johnson and Ms. See's way back toward Ms. Johnson's home, Mr. Johnson heard "arguing and screaming" and "a lot of commotion." Mr. Johnson said he saw the "guy outside the fence" shoot twice and "somebody slump forward," but he "didn't know who was on the porch at the time." Mr. Johnson knew one of the individuals was female "because she was shouting and screaming," and he said he came to learn that the person "slumped over" was the petitioner. Mr. Johnson said, "[T]he initial first two shots, I hear, 'Oh'— . . . that came from a male it sounded like. And then the screaming, that came from a female as he continued his fire." After hearing the initial shots and seeing someone slump over, Mr. Johnson claimed to have heard "a number of shots," and he said that he and Ms. See ran.

The circuit court denied the petitioner's motion for a new trial asserting newly discovered evidence. The court found that Mr. Johnson's identity was known prior to and during trial, and Mr. Johnson had refused Detective Howery's request for an interview. The court also found that the petitioner did not exercise due diligence because he did not attempt to speak to Mr. Johnson after being notified of his identity. The court found that "[i]t appears that Mr. Johnson may have fabricated his statement to fit the [petitioner's] outlandish theory which no witness at trial can corroborate." The court also cited to the petitioner and Mr. Johnson's close familial bond and fact that they were incarcerated together, finding that it was reasonable to believe that they discussed the night of the murder while incarcerated. No witnesses placed Mr. Johnson at the house on the night of the murder, further calling into question the credibility of his statement. In addition, the upward trajectory of the victim's gunshot wounds showed that the shooter was either low to the ground or slumped over, and the .45 caliber bullet casings were found primarily near the porch area, so the physical evidence did not support Mr. Johnson's account that someone in a standing, upright position outside or near the fence shot the victim. The court concluded that the proffered evidence would not have produced an opposite result at trial.

The circuit court sentenced the petitioner to life incarceration without mercy for first-degree murder, to a determinate five-year term for possession of a firearm by a prohibited person, and to one year in the regional jail for domestic battery. The court ordered that the petitioner's sentences be served consecutively. The petitioner now appeals from the court's August 31, 2022, disposition order.

The petitioner raises four assignments of error. First, the petitioner argues that the circuit court should not have considered Mr. Elliott's prior inconsistent statement that he saw the

petitioner shoot the victim for its truth. The petitioner asserts that he was unaware the court would consider Mr. Elliott's prior statement for its truth, only learning of the claimed error upon receipt of the court's verdict order, so he asserts that plain error resulted. In his second assignment of error, which we consider alongside his first, he contends that, without improperly considering Mr. Elliott's prior inconsistent statement for its truth, the evidence was insufficient to support his convictions. The petitioner argues that "the critical facts" have not been "shown by the direct evidence." He highlights credibility issues with the State's witnesses and argues that "this is a circumstantial case from which it cannot be determined who shot the victim," nor can it be discerned "whether the person who shot the victim was justified in doing so, whether it be [the petitioner] acting in self-defense or the unidentified skinny black male acting in defense of another (saving [the petitioner's] life)."

Because the petitioner did not object at trial on hearsay grounds to the playing of Mr. Elliott's statement to the police, our review is for plain error, as the petitioner acknowledges. *See* Syl. Pt. 1, *State v. Blickenstaff*, 239 W. Va. 627, 804 S.E.2d 877 (2017) (quoting Syl. Pt. 3, *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 694 S.E.2d 815 (2010)) ("An objection to a circuit court ruling that admits evidence must be timely made and must state the specific ground of the objection, if the specific ground is not apparent from the context."). "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). "To affect substantial rights means the error was prejudicial. It must have affected the outcome of the proceedings in the circuit court, and the defendant rather than the prosecutor bears the burden of persuasion with respect to prejudice." *Id.* at 7, 459 S.E.2d at 118, Syl. Pt. 9, in part. In assessing the sufficiency of the evidence, "the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. Pt. 1, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

> The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court[, and] a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d 169, Syl. Pt. 3, in part.

"Rule 607 of the West Virginia Rules of Evidence allows a party, including the one who called the witness, to impeach a witness by a prior inconsistent statement." Syl. Pt. 3, *State v. Collins*, 186 W. Va. 1, 409 S.E.2d 181 (1990). But prior inconsistent statements "may not be admitted as substantive evidence: The inconsistent statement only serves to raise doubts regarding the truthfulness of both statements of the witness." *State v. Blake*, 197 W. Va. 700, 706, 478 S.E.2d 550, 556 (1996) (citation omitted). Although the circuit court's verdict order contains references to Mr. Elliott's statement to the police that suggest the court considered that statement as substantive evidence, this is not one of the rare cases in which plain error resulted. *See* Syl. Pt. 4, in part, *State v. England*, 180 W. Va. 342, 376 S.E.2d 548 (1988) ("[T]he doctrine is to be used sparingly and only in those circumstances where substantial rights are affected, or the truth-finding

process is substantially impaired, or a miscarriage of justice would otherwise result."). The evidence at trial showed that the petitioner was the only male present at Ms. Johnson's home on January 15, 2019, and he arrived in a white Ford Excursion. Ms. Johnson testified that the petitioner and the victim, who previously dated, began arguing; he became "enraged"; and he threatened to kill, choked, smacked, and punched the victim, drawing blood. Ms. Johnson saw him with a gun during this attack. Multiple witnesses heard gunshots moments later and saw a white SUV flee the scene immediately after those shots. Gunshot residue was found on the steering wheel and front middle console of an abandoned white Ford Excursion recovered shortly after the victim's murder. The petitioner fled the state, stopping first at a friend's house, where he suspiciously denied the ability to obtain medical treatment for what appeared to be gunshot wounds. Thus, without considering Mr. Elliott's prior inconsistent statement that he saw the petitioner with a gun or saw the petitioner shoot the victim, it is clear that the evidence was sufficient to support the petitioner's guilt, so any error related to that prior inconsistent statement did not affect the outcome of the petitioner's trial. Due further to the strength of the evidence, any error related to Mr. Elliott's prior inconsistent statement did not seriously affect the fairness or integrity of the petitioner's trial.

For these same reasons, the petitioner's challenge to the sufficiency of the evidence fails. Notably, the petitioner does not identify any element that the State failed to prove. Rather, he takes issues with the credibility of the witnesses and circumstantial quality of some of the evidence. These types of complaints are not enough to meet the "heavy burden" a defendant challenging the sufficiency of the evidence undertakes. *See Guthrie*, 194 W. Va. at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part (holding that a defendant challenging the sufficiency of the evidence "takes on a heavy burden"). This is so because "there is no qualitative difference between direct and circumstantial evidence," *id*. at 669, 461 S.E.2d at 175, and it is within the exclusive province of the trier of fact to "decide the credibility of witnesses [and] weigh evidence." *Id.* at 669 n.9, 461 S.E.2d at 175 n.9 (citation omitted). As detailed above, it cannot be said there is no evidence from which the petitioner's guilt could be found, so his verdicts will not be set aside.

In the petitioner's third assignment of error, he claims that the circuit court erred in denying his motion for a new trial predicated on newly discovered evidence. He asserts that Mr. Johnson's statement was received after trial and that he was diligent in securing it because he had no reason to know that Mr. Johnson witnessed any of the shooting. The petitioner argues that the evidence is new and material, as no other witness "witnessed the entire shooting incident," and he claims that Mr. Johnson's statement ought to produce an opposite result at trial as he was the "ONLY eyewitness to the entire shooting." Finally, the petitioner argues that the sole purpose of Mr. Johnson's evidence is not to discredit a witness; "[i]t is merely a new piece of evidence."

We have identified five elements that must be satisfied before a new trial will be granted on the basis of newly discovered evidence:

> (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is

8

additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side.

Syl., in part, *State v. Frazier*, 162 W. Va. 935, 253 S.E.2d 534 (1979) (quoting *Halstead v. Horton*, 38 W. Va. 727, 18 S.E. 953 (1894)). "[A]ll five elements must be satisfied," *Frazier*, 162 W. Va. at 941, 253 S.E.2d at 537 (citation omitted), and a new trial on the basis of newly discovered evidence "is seldom granted and the circumstances must be unusual or special." Syl. Pt. 9, in part, *State v. Hamric*, 151 W. Va. 1, 151 S.E.2d 252 (1966). Furthermore, "we will not disturb the lower court's conclusions when there is factual support for such findings unless the lower court's conclusions are plainly wrong or against the weight of the evidence." *State v. Crouch*, 191 W. Va. 272, 276, 445 S.E.2d 213, 217 (1994).

First, the circuit court did not err in determining that there is no evidence that the petitioner was diligent in ascertaining and securing the evidence. Mr. Johnson was known to the petitioner: Mr. Johnson is the petitioner's cousin; his blood was found in the Ford Excursion linked to the petitioner and the crimes of which he was convicted; and, if Mr. Johnson's account is to be believed, he was at Ms. Johnson's home on the night of and shortly before the victim's murder, socializing with the petitioner. Unquestionably, due diligence could have secured Mr. Johnson's statement before trial. Although the petitioner's failure on this element alone justifies affirming the court's denial of the petitioner's motion for a new trial, we nevertheless observe, second, that Mr. Johnson's "evidence" is not "such as ought to produce an opposite result at a second trial." *Frazier*, 162 W. Va. at 935, 235 S.E.2d at 534, Syl., in part. None of the witnesses present inside Ms. Johnson's home on the night of the victim's murder testified to Mr. Johnson being there, and the witnesses who testified to seeing people outside of Ms. Johnson's home testified to seeing only two people, not three, as Mr. Johnson's version requires accepting. Plus, neither the trajectory of the gunshots to the victim nor the location of the bullet casings left following the shooting corroborate Mr. Johnson's account. The court, accordingly, did not err in determining that Mr. Johnson's statement would not produce an opposite result at trial, and it, therefore, did not err in denying the petitioner a new trial on the basis of newly discovered evidence.

Finally, the petitioner claims in his fourth assignment of error that the circuit court erred in denying his motion to dismiss the indictment where Detective Howery failed to advise the grand jury that (1) witnesses inside Ms. Johnson's home denied hearing or seeing an altercation between the petitioner and the victim, (2) the victim had a gun, and (3) the victim shot the petitioner. The petitioner maintains that the "omission of this exculpatory information is the very definition of fraud" and that he should have been afforded a hearing on this issue.

"Our standard of review of a motion to dismiss an indictment is generally *de novo*." *State v. Davis*, 205 W. Va. 569, 578, 519 S.E.2d 852, 861 (1999). But "[e]xcept for willful, intentional fraud the law of this State does not permit the court to go behind an indictment to inquire into the evidence considered by the grand jury, either to determine its legality or its sufficiency." Syl., *Barker v. Fox*, 160 W. Va. 749, 238 S.E.2d 235 (1977). And a defendant is only entitled to a hearing with compulsory process once a prima facie case of willful, intentional fraud has been established. Syl. Pt. 3, *State ex rel. Pinson v. Maynard*, 181 W. Va. 662, 383 S.E.2d 844 (1989) (quoting *Barker*, 160 W. Va. at 753, 238 S.E.2d at 237). Although couched in terms of "fraud,"

9

the petitioner does not actually allege fraud.[8] Rather, his complaint centers on Detective Howery's failure to provide the grand jury with evidence he characterizes as exculpatory—an argument that misapprehends the function of the grand jury.[9] The function "is not to determine the truth of the charges against the defendant, but to determine whether there is sufficient probable cause to require the defendant to stand trial." *Pinson*, 181 W. Va. at 665, 383 S.E.2d at 848 (citation omitted). Without having established a prima facie case of willful, intentional fraud in the first instance, the petitioner was not entitled to a hearing, so the court did not err in not affording a hearing or in denying the petitioner's motion to dismiss the indictment.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** October 22, 2024

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice John A. Hutchison
Justice William R. Wooton
Justice C. Haley Bunn

---

[8] The petitioner also shirks the requirement of demonstrating willful, intentional conduct.

[9] We note, too, that "if the evidence that satisfied the grand jury that probable cause exists for the prosecution of a defendant was not sufficient to satisfy a court or a petit jury, the defendant could be vindicated by an acquittal at trial." *Pinson*, 181 W. Va. at 666, 383 S.E.2d at 848 (citation omitted). The evidence the petitioner claims was exculpatory was, in view of his convictions, clearly not.

10